753 A.2d 41

## Mary WILLIAMS et al.

v.

## The MAYOR & CITY COUNCIL OF BALTIMORE et al.

**No. 124, Sept. Term, 1999.**

Court of Appeals of Maryland.

June 8, 2000.

Joseph Kaufman and Howard J. Schulman (Schulman & Kaufman, LLC, on brief), Baltimore, for petitioners.

Sean Malone (Dara L. Munoz, on brief), Baltimore, for respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and THEODORE G. BLOOM, (retired, specially assigned), JJ.

CATHELL, Judge.

On November 6, 1996, petitioners, Mary Williams *et al.*,[1] brought this negligence action in the Circuit Court for Baltimore City against the State of Maryland, the Mayor and City Council of Baltimore, and Baltimore City Police Officer Edward Colbert, under the Maryland Tort Claims Act and the Local Government Tort Claims Act. The claim arose out of a domestic violence incident in which Gerald Watkins shot and partially paralyzed Mary Williams, his girlfriend's mother, shot and killed Valerie Williams, his girlfriend and mother of his child, and then shot and killed himself. On January 22, 1997, the Circuit Court for Baltimore City dismissed the claims against the State and the City. The case proceeded against Officer Colbert until February 27, 1998, when another judge on the Circuit Court for Baltimore City entered summary judgment in favor of the police officer. Petitioners appealed to the Court of Special Appeals, challenging the two orders issued by the judges.[2] In an opinion filed September 7, 1999, that court affirmed the judgments of the trial court. *Williams v. Mayor & City Council of Baltimore*, 128 Md.App. 1, 736 A.2d 1084 (1999). Petitioners presented three questions to this Court, for which we granted certiorari:

I. Was [respondent] Officer Colbert divested of discretion and mandated by [Maryland Code (1957, 1996 Repl.Vol., 1999 Cum.Supp.),] Article 27, § 798(B)(2)

---

**1.** The suit below was filed on behalf of Mary Williams, individually; Mary Williams, as next friend and guardian of Myreq Watkins; Mary Williams, as Personal Representative of the Estate of Valerie Williams; and Leroy Williams, father of Valerie Williams, individually.

**2.** Specifically, on appeal to the Court of Special Appeals, petitioner contended:
 1. that the trial court erred in granting summary judgment in favor of Officer Colbert based on its finding that Officer Colbert was entitled to qualified immunity; and
 2. that the Mayor and City Council of Baltimore are subject to suit for the actions of Baltimore City police officers under the Local Government Tort Claims Act.

*Williams v. Mayor & City Council of Baltimore*, 128 Md.App. 1, 6, 736 A.2d 1084, 1087 (1999).

and [Baltimore City] Police Department General Order 10–93 [3] to protect [petitioners]?

II. Did [respondent Officer] Colbert's affirmative actions and specific promises of protection to Mary and Valerie Williams, which were reasonably relied upon by them, to their detriment, create a special relationship between [respondent] and Mary and Valerie Williams which created a duty of protection on the part of [respondent] Colbert?

III. Were Officer Colbert's actions at 622 Melville Avenue protected by either statutory or common law immunity?

Petitioners did not present the dismissal of their complaint against the State or the City in their petition for writ of certiorari to this Court; nor did they present the Court of Special Appeals' decision affirming the dismissal of their complaint against the City. In the proceeding before us, they present only the claims against Officer Colbert.[4] We resolve the issues presented in the context of the trial court's granting of Officer Colbert's motion for summary judgment.

## I. Facts

The facts and circumstances of the present case are tragic. By July of 1995, eighteen-year-old Valerie Williams had been involved in an abusive relationship with Gerald Watkins for approximately four years. The record indicates that Watkins began beating Valerie Williams when she was around fourteen years old and that the beatings continued while she was pregnant with his child. On numerous occasions, the Balti-

---

3. The General Order is now codified as Baltimore City Police Department General Order G–11.

4. We do not address the responsibilities of the City, if any, under Maryland Code (1973, 1998 Repl.Vol., 1999 Cum.Supp.), Title 5, subtitle 3 of the Courts & Judicial Proceedings Article (the Local Government Tort Claims Act) for paying a judgment, if any, that might be rendered against Officer Colbert.

more City Police Department was notified and responded to these incidents of domestic violence.

On the morning of July 19, 1995, Mary Williams arrived at work as an office manager for Multi–Specialty Health Care, at approximately 8:45 a.m. Just before her lunch break, she received a frantic telephone call from her daughter, Valerie Williams. Mary Williams immediately left work and drove to her home at 622 Melville Avenue, in Baltimore, where she found her daughter sitting on a sofa with a swollen eye and holding a compress to her mouth. After Valerie Williams told her that she had been beaten by Watkins, Mary Williams telephoned the police via 911. Officer Colbert responded to the call.

Upon arriving at the scene, Officer Colbert took statements from both Mary and Valerie Williams, during which he was informed of the history of abuse suffered by Valerie at the hands of Watkins. Valerie proceeded to inform Officer Colbert that Watkins was a known drug dealer and provided the officer with a photograph of Watkins and his home address. While the officer was talking to the Williamses, Watkins telephoned the household two separate times and talked with both Mary and Valerie. Valerie answered the first telephone call. After she hung up, she told Mary, in the officer's presence, that the call was from Watkins and that he had threatened to come back to the house. When Watkins called a second time, Mary Williams answered the telephone. Upon realizing that the caller was Watkins, Mary Williams briefly expressed her anger to him and then hung up the telephone. The Caller I.D. box indicated that he had called from the Alameda Liquor Store. She reported that fact to Officer Colbert, whereupon he requested a police car to be dispatched to that location. From this point forward, the parties' versions of the events diverge dramatically. We review the depositions of both Mary Williams and Officer Colbert.

According to the deposition of Mary Williams, after Officer Colbert dispatched a police car to the Alameda Liquor Store, he then stated to Valerie "You stay here, I've got to call for a

camera, we have to wait for a camera." [5] At this point, Mary had a brief conversation with Officer Colbert asking whether she could pick up her grandson from a neighboring house.[6] With Officer Colbert's approval, Mary left to retrieve her grandson from the babysitter. Upon returning home, she immediately noticed that Officer Colbert was no longer in the house. When she asked Valerie where he was, she replied, "[h]e said stay here, he went out to the car." Mary Williams, carrying her grandson, then went out the front door of her house and down the steps to the sidewalk where Officer Colbert was sitting in a police car. She asked him, "What's next[?]," to which he replied, "I've got to write this report," followed by "go in the house, I'm going to be here, I've got to finish this report." According to Mary Williams, no further relevant information was exchanged between them.

Mary Williams returned to the house and did not lock the front door. Approximately two to three minutes later, Valerie informed Mary that Watkins had recently been threatening to kill her. Upon hearing this news, Mary panicked and went to the front door to tell Officer Colbert. Mary arrived at the front door to discover that Officer Colbert was no longer parked in front of her house. Instead, she saw Gerald Watkins running up the steps to her home. She tried to shut the door and lock it but Watkins kicked the door open. Carrying her grandson, Mary made it past Watkins and started running down the steps in front of her house. Watkins shot her in the leg, which caused her to fall down the steps. Watkins then put the gun to Mary's head, said "What have I ever done to you?" and pulled the trigger, shooting her again. Watkins then shot and killed Valerie Williams before killing himself. Mary Williams survived the attack but remains partially para-

---

5. Under Baltimore City Police Department procedure, it is required that photographs be taken of alleged victims of domestic violence for future evidentiary purposes.

6. Her grandson, Myreq Watkins, was her daughter Valerie's son by Gerald Watkins.

lyzed. Myreq Watkins was not injured in the course of the shooting.

Officer Colbert's version of the events is similar to Mary Williams' up until when Mary Williams came outside of her house and had a conversation with the police officer. According to his deposition, when she approached his police car and asked, "What's next?," the following events occurred:

I told her I'm waiting to see if somebody is available to bring me a camera. At that time I called again. There was nobody available to bring a camera. I then told Ms. Williams I have to go get the camera myself, and she said that was fine.

According to Officer Colbert, it was only after this exchange that he drove off to go pick up a camera. He was approximately 6–7 blocks away when he received a call about a shooting at 622 Melville Avenue. Upon his return he found Mary Williams laying face-down on the ground in front of her home and the bodies of Valerie Williams and Gerald Watkins down the street.

On November 6, 1996, petitioners filed a complaint based in negligence in the Circuit Court for Baltimore City against (1) the State of Maryland under Maryland Code (1984, 1999 Repl.Vol.), Title 12, subtitle 1, of the State Government Article (the Maryland Tort Claims Act); (2) the Mayor and City Council of Baltimore City under Maryland Code (1973, 1998 Repl.Vol., 1999 Cum.Supp.), Title 5, subtitle 3 of the Courts & Judicial Proceedings Article (the Local Government Tort Claims Act); and Baltimore City Police Officer Edward Colbert. The complaint specifically alleged that Baltimore City Police Department General Order 10–93 divested Officer Colbert of any discretion in carrying out his statutory duty to protect Valerie and Mary Williams and Myreq Watkins and mandated that he do so. In later pleadings, petitioners added that Maryland Code (1957, 1993 Repl.Vol., 1995 Cum.Supp.), Article 27, section 11F,[7] also supported this argument. The

---

**7.** Effective October 1, 1996, 1996 Maryland Laws, Chapter 585 transferred Maryland Code (1957, 1993 Repl.Vol., 1995 Cum.Supp.), Article

complaint also alleged that Officer Colbert, through his actions and express promise of protection, had established a "special relationship" with petitioners that imposed on him a duty of protection beyond that which he would ordinarily owe to citizens threatened by crime. An order dismissing the complaints against both the City and the State was issued on January 17, 1997, ruling that neither of those parties could be sued because of the provisions of the respective tort claims acts. On February 27, 1998, a different judge on the Circuit Court for Baltimore City entered summary judgment in favor of the police officer. The court ruled that, as a matter of law, Officer Colbert was acting in a discretionary capacity, without malice, at the time of the incident and was therefore entitled to qualified immunity as a government official.

Petitioners appealed to the Court of Special Appeals challenging the orders of the circuit court.[8] That court affirmed the holdings of the trial court in *Williams*, 128 Md.App. 1, 736 A.2d 1084. Petitioners filed a petition for writ of certiorari to this Court which we granted to resolve the three issues. As to the grant of summary judgment in respect to Officer Colbert, we hold that under the circumstances of this case he was not mandated by Maryland Code (1957, 1996 Repl.Vol., 1999 Cum.Supp.), Article 27, section 798(b)(2)[9] and Baltimore City Police Department General Order 10–93 to protect petitioners. Nevertheless, we hold that, viewing the deposition of Mary Williams in a light favorable to her, Officer Colbert's affirmative actions, directions, and specific promises of protec-

---

27, section 11F to its current location, Maryland Code (1957, 1996 Repl.Vol., 1999 Cum.Supp.), Article 27, section 798. There were no substantive changes made in the transfer. Any future reference to Article 27, section 11F, is a reference to Maryland Code (1957, 1993 Repl.Vol., 1995 Cum.Supp.), Article 27, section 11F, unless otherwise noted.

**8.** Petitioners did not appeal the dismissal of their complaint against the State of Maryland to the Court of Special Appeals.

**9.** Any future reference to section 798(b)(2) is a reference to Maryland Code (1957, 1996 Repl.Vol., 1999 Cum.Supp.), Article 27, section 798(b)(2), unless stated otherwise.

tion to Mary and Valerie Williams, if they occurred and were reasonably relied upon by them, may have created a special relationship between himself and the Williamses that would establish a duty of care on the part of Officer Colbert to protect them; therefore, his actions at 622 Melville Avenue might not be protected by either statutory or common law immunity. Accordingly, there was, at the least, a dispute of a material fact. We reverse the decision of the Court of Special Appeals and remand with instructions to vacate the order of the Circuit Court for Baltimore City granting Officer Colbert summary judgment.

## II. Discussion

The threshold issue before this Court is whether respondent, Officer Colbert, was entitled to summary judgment as a matter of law. In reviewing a grant of a summary judgment, we are first concerned with whether a genuine dispute of material fact exists and then whether the movant is entitled to summary judgment as a matter of law. *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,* 335 Md. 135, 144, 642 A.2d 219, 224 (1994); *Gross v. Sussex, Inc.,* 332 Md. 247, 255, 630 A.2d 1156, 1160 (1993); *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 737, 625 A.2d 1005, 1011 (1993); *Arnold Developer, Inc. v. Collins,* 318 Md. 259, 262, 567 A.2d 949, 951 (1990); *Bachmann v. Glazer & Glazer, Inc.,* 316 Md. 405, 408, 559 A.2d 365, 366 (1989); *King v. Bankerd,* 303 Md. 98, 110–11, 492 A.2d 608, 614 (1985). "A material fact is a fact the resolution of which will somehow affect the outcome of the case." *King,* 303 Md. at 111, 492 A.2d at 614 (citing *Lynx, Inc. v. Ordnance Prods., Inc.,* 273 Md. 1, 8, 327 A.2d 502, 509 (1974)). "[A] dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment." *Salisbury Beauty Schs. v. State Bd. of Cosmetologists,* 268 Md. 32, 40, 300 A.2d 367, 374 (1973).

This Court also has stated that "[t]he standard of review for a grant of summary judgment is whether the trial court was legally correct." *Goodwich v. Sinai Hosp. of Balti-*

*more, Inc.,* 343 Md. 185, 204, 680 A.2d 1067, 1076 (1996); *see also Murphy v. Merzbacher,* 346 Md. 525, 530–31, 697 A.2d 861, 864 (1997); *Hartford Ins. Co.,* 335 Md. at 144, 642 A.2d at 224; *Gross,* 332 Md. at 255, 630 A.2d at 1160; *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 592, 578 A.2d 1202, 1206 (1990). As we have said:

> Concerning summary judgment, Maryland Rule 2–501(e) provides: "The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." In determining whether a party is entitled to judgment under this rule, the court must view the facts, including all inferences, in the light most favorable to the opposing party. *Beard v. American Agency,* 314 Md. 235, 246, 550 A.2d 677 (1988); *Kramer v. Bally's Park Place,* 311 Md. 387, 389, 535 A.2d 466 (1988); *Liscombe v. Potomac Edison Co.,* 303 Md. 619, 621–22, 495 A.2d 838 (1985). The trial court will not determine any disputed facts, but rather makes a ruling as a matter of law. *Scroggins v. Dahne,* 335 Md. 688, 691, 645 A.2d 1160 (1994); *Southland Corp. v. Griffith,* 332 Md. 704, 712, 633 A.2d 84 (1993); *Beatty v. Trailmaster,* 330 Md. 726, 737, 625 A.2d 1005 (1993). The standard of appellate review, therefore, is whether the trial court was legally correct. *See, e.g., Southland, supra,* 332 Md. at 712, 633 A.2d 84.

*Baltimore Gas & Elec. Co. v. Lane,* 338 Md. 34, 42–43, 656 A.2d 307, 311 (1995); *see also Dobbins v. Washington Suburban Sanitary Comm'n,* 338 Md. 341, 344–45, 658 A.2d 675, 676–77 (1995). As we said in *Ashton v. Brown,* 339 Md. 70, 660 A.2d 447 (1995):

> In reviewing the grant of summary judgment, this Court must consider the facts reflected in the pleadings, depositions, answers to interrogatories and affidavits in the light most favorable to the non-moving parties, the plaintiffs. Even if it appears that the relevant facts are undisputed, "if those facts are susceptible to inferences supporting the

position of the party opposing summary judgment, then a grant of summary judgment is improper."

*Id.* at 79, 660 A.2d at 452 (quoting *Clea v. Mayor & City Council of Baltimore,* 312 Md. 662, 677, 541 A.2d 1303, 1310 (1988)).

The purpose of the summary judgment procedure is not to try the case or to decide the factual disputes, but to decide whether there is an issue of fact, which is sufficiently material to be tried. *See Goodwich,* 343 Md. at 205–06, 680 A.2d at 1077; *Coffey v. Derby Steel Co.,* 291 Md. 241, 247, 434 A.2d 564, 567–68 (1981); *Berkey v. Delia,* 287 Md. 302, 304, 413 A.2d 170, 171 (1980). Thus, once the moving party has provided the court with sufficient grounds for summary judgment, the non-moving party must produce sufficient evidence to the trial court that a genuine dispute to a material fact exists. *See, e.g., Hoffman Chevrolet, Inc. v. Washington County Nat'l Sav. Bank,* 297 Md. 691, 712, 467 A.2d 758, 769 (1983). With these considerations in mind, we turn to the instant case.

### A. Article 27, section 798(b)(2) and BCPD General Order 10–93

Petitioners allege that Officer Colbert was divested of discretion and mandated by Maryland Code (1957, 1996 Repl. Vol., 1999 Cum.Supp.), Article 27, section 798 and Baltimore City Police Department General Order 10–93 to protect Mary and Valerie Williams and Myreq Watkins. We disagree.

We commence our analysis of these two provisions by shedding light on the legislative intent behind Article 27, section 798. As we said in *State v. Bell,* 351 Md. 709, 720 A.2d 311(1998):

We have said that "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995). Legislative intent must be sought first in the actual language of the statute. *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.,* 346 Md. 437, 444–

45, 697 A.2d 455, 458 (1997); *Stanford v. Maryland Police Training & Correctional Comm'n,* 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (quoting *Tidewater v. Mayor of Havre de Grace,* 337 Md. 338, 344, 653 A.2d 468, 472 (1995)); *Coburn v. Coburn,* 342 Md. 244, 256, 674 A.2d 951, 957 (1996); *Romm v. Flax,* 340 Md. 690, 693, 668 A.2d 1, 2 (1995); *Oaks,* 339 Md. at 35, 660 A.2d at 429; *Mauzy v. Hornbeck,* 285 Md. 84, 92, 400 A.2d 1091, 1096 (1979); *Board of Supervisors v. Weiss,* 217 Md. 133, 136, 141 A.2d 734, 736 (1958). Where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts normally do not look beyond the words of the statute to determine legislative intent. *Marriott Employees,* 346 Md. at 445, 697 A.2d at 458; *Kaczorowski v. Mayor of Baltimore,* 309 Md. 505, 515, 525 A.2d 628, 633 (1987); *Hunt v. Montgomery County,* 248 Md. 403, 414, 237 A.2d 35, 41 (1968).

. . . .

This Court recently stated that "statutory language is not read in isolation, but 'in light of the full context in which [it] appear[s], and in light of external manifestations of intent or general purpose available through other evidence.'" *Stanford v. Maryland Police Training & Correctional Comm'n,* 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (alterations in original) (quoting *Cunningham v. State,* 318 Md. 182, 185, 567 A.2d 126, 127 (1989)). To this end,

[w]hen we pursue the context of statutory language, we are not limited to the words of the statute as they are printed.... We may and often must consider other "external manifestations" or "persuasive evidence," including a bill's title and function paragraphs, amendments that occurred as it passed through the legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.

... [I]n *State v. One 1983 Chevrolet Van,* 309 Md. 327, 524 A.2d 51 (1987), ... [a]lthough we did not describe any of the statutes involved in that case as ambiguous or uncertain, we did search for legislative purpose or meaning—what Judge Orth, writing for the Court, described as "the legislative scheme." [*Id.* at] 344–45, 524 A.2d at 59. We identified that scheme or purpose after an extensive review of the context of Ch. 549, Acts of 1984, which had effected major changes in Art. 27, § 297. That context included, among other things, a bill request form, prior legislation, a legislative committee report, a bill title, related statutes and amendments to the bill. *See also Ogrinz v. James,* 309 Md. 381, 524 A.2d 77 (1987), in which we considered legislative history (a committee report) to assist in construing legislation that we did not identify as ambiguous or of uncertain meaning.

*Kaczorowski,* 309 Md. at 514–15, 525 A.2d at 632–33 (some citations omitted).

*Id.* at 717–19, 720 A.2d at 315–16 (some alterations in original).

Section 798 was originally enacted in 1979 as Maryland Code (1957, 1976 Repl.Vol., 1981 Cum.Supp.), Article 27, section 11F. The implementation of section 11F originated in 1979 Maryland Laws, Chapter 307 (House Bill 53). The original title to House Bill 53 outlined its purpose:

[For] the purpose of establishing an emergency procedure available to victims of spousal violence in order to inform them of services available, provide transportation, and provide protection so that they may return safely to the family home in order to remove certain necessary personal property; establish an emergency procedure for the protection of children during incidents of spousal violence; coordinating certain statutory provisions; defining certain terms; and relating generally to spousal violence.

Throughout the bill file to House Bill 53 there were several letters and written testimony supporting the passage of this bill. The general theme of these documents is an intent by the sponsors and supporters of this bill to alleviate the plight

of the spousal assault victim by broadening both the obligation and the authority of the police to intervene. Nearly everyone involved acknowledged that in many instances of spousal abuse, although the violent episode may have subsided prior to the arrival of the police, the situation frequently remained a dangerous and possibly deadly situation.

Delegate (now Senator) Ida G. Ruben of Montgomery County, sponsor of House Bill 53, clearly explained the purpose of the Bill:

> When domestic violence occurs, the usual procedures available immediately after the fact are not satisfactory for the victims, for the police or for the courts. This bill is a result of my concern for a person who has been abused at home, thrown out of the home, or forced to run from the home and who has no place to turn for help....
>
> ....
>
> The purpose of this bill is to provide emergency protection in spousal violence cases so that the victims are offered some real choices and so that the time spent on such matters by police and courts can be spent more productively....
>
> *All this bill asks for is emergency assistance for such people to enter their own homes and take a few of their personal belongings so that they can exist for a short time elsewhere until a longer term resolution of their problems can proceed in an orderly way* .... Most of these victims do not have money in their pockets at the time of the crisis in order to go out and buy duplicates of their clothing and other necessities. They may have children with them for whom they need clothing, medications or essential documents. [Emphasis added.] [10]

---

10. At a later date, Delegate Ruben discussed the amendments made to House Bill 53:

> [One amendment] is offered to make clear that the bill preserves such discretionary authority as now applies to law enforcement agencies, while mandating that they offer protection and transportation only as directed by a court order.

A number of other people testified in favor of House Bill 53. On February 22, 1979, Katherine Foss, of the Prince George's County Department of Social Services, testified:

> The large majority [of women who participated in their emergency shelter program over the last year] left home with nothing but the clothes on their backs. In all cases the women were extremely fearful. They were fearful to return home and fearful that if they left home all their possessions would be lost.

> In many cases, when the woman has returned home she has found that her clothes have been ripped apart or thrown out. In one case the husband set fire to the apartment; in another case the husband removed his wife's belongings from the house and burned them. Many times she finds upon returning home that her husband has changed the locks to the house or apartment and the landlord refuses to allow her entrance, even though her name is on the lease and she may have been paying the rent.

> . . . .

> This destruction is particularly wasteful and costly in view of the fact that the Department often must issue an emergency grant to provide such victims with basic necessities such as clothing. If a Public Assistance Grant is necessary, the application process is impeded by her lack of verifying documents, birth certificates, rent receipts, etc.

Cynthia Anderson, Supervisor of the Abused Persons Program in Montgomery County testified on February 22, 1979:

> Law enforcement officers are generally the first line of community intervention in abusive domestic disputes. They represent community authority and are often able to temporarily diffuse the immediate crisis. However, after they leave the home, the victim is sometimes threatened again, or further abused because of the police intervention. A consistent mechanism is needed so that every victim of spousal abuse may have a choice of remaining in the home or *leaving by police escort to a safe place.* It is appropriate, therefore, for law enforcement officials to be knowledgeable

of shelter services, be required to advise the victim of these alternatives, and be available to assist the victim to such facilities.

In those cases where the victim has already fled the home—to the protection of a neighbor or friend— *it is equally urgent for them to have safe return into the home to retrieve those necessary personal belongings that will enable them to remain separate.* If a woman decides to live apart from the violent home, she may need to apply for State services for financial aid, employment training, and legal services. These State services, A.F.D.C. and JUDICARE, require proof for eligibility in the form of bank statements, pay records, birth certificates.

Therefore, it becomes essential for the victim to be able to gather these documents in addition to gathering personal effects that will enable them to constructively move towards an independent living arrangement. [Emphasis added.]

Elizabeth Fischer, Executive Director of ASSISI, Inc., also testified on February 22, 1979:

As a representative of ASSISI, I strongly urge your support for this bill for one reason; the battered woman, and I ask you to try to put yourself in this woman's shoes. She has just been beaten. She is scared. She may need medical attention. In most cases she will not stop to get her purse, her clothes; it is usually night time; sometimes she is in her nightgown, barefooted. Where does she go? Who does she go to?

When she gets to a police station she needs to be told where to get help. *But then, what about her money, a change of clothes. Doesn't she have a right to her personal things?* Yes, you say and here, we all agree. But almost always she is afraid; afraid of being beaten again. If she goes back alone, she is taking a risk of being beaten again. If she takes a family member or a friend, someone who is untrained, she is exposing them to assault. *She needs a trained person to standby while she gets her personal effects.*

In 34% of the cases ASSISI has handled, women have had their clothes shredded or disappear after an assault; their jewelry missing. And think how vital toothpaste and deod[o]rant would be to you if you had none and had no money, checks or identification. In order to get Social Service assistance, she needs her birth certificate and identification.

This is all we are asking in this bill:

(1) let the woman know what help is available and

(2) let her get the things she needs until pending further action. [Emphasis added.]

On April 4, 1979, Carol Lane, President of the Board of Directors of Citizens Against Spousal Assault (CASA) of Howard County testified in support of House Bill 53:

Our continuing experience with victims of domestic violence indicates the need for passage of a law that will provide these people with a measure of safety in the face of danger and a sense of pride in the face of degradation—the degradation of needing not just to flee one's home but to flee without clothing, toothbrush or other personal belongings necessary to reside elsewhere temporarily. We have seen women bruised and beaten who have run or have been chased from their homes, often in fear of their lives, without their personal belongings, medication for themselves or the children in their care; they must "sneak" back, in dread of harm, to retrieve a coat, a baby bottle, or other personal effects.

. . . .

House Bill [ ]53 as amended will have the effect of guaranteeing certain rights to our citizens: protection from violence *and the right to enter their own dwelling to remove personal belongings without fear of additional harm.* [Emphasis added.]

In addition to the testimony outlined, *supra,* the bill file also included several letters that provide us with further information presented to the Legislature when it was considering House Bill 53. In a letter dated February 16, 1979, Annette

Flower, President of the Baltimore County Commission for Women, wrote to Delegate Joseph E. Owens, Chairman of the House Judiciary Committee, in support of House Bill 53:

This bill would insure that victims of spousal violence *receive protection in removing necessary belongings from the family home,* and that they are informed of the availability of public or private support agencies in their locality.

Domestic violence is a growing problem throughout Maryland, and indeed throughout the country. All too often, the victim of spousal violence is not only subjected to physical and psychological abuse, but is forced to flee the home without adequate clothing, perhaps even without identification, prescription medicines, eyeglasses, and other necessary personal items. *By providing the protection of an law enforcement agency for victims to retrieve such personal belongings,* HB–53 will insure at least minimal physical comfort during the period when the victim must remain away from the family home. Informing victims of available support agencies can be accomplished by giving them a printed card or brochure.... [Emphasis added.]

As evidenced by the original title as well as the supporting testimony and letters, the initial goals of House Bill 53 initially had a much greater scope than what was ultimately enacted by the Legislature. This is primarily due to the reaction of Maryland's police organizations. In response to the initial version of House Bill 53, a Joint Police Committee [11] drafted a letter dated February 2, 1979, to Delegate Joseph E. Owens, Chairman of the House Judiciary Committee, which demonstrated their general approval of the bill along with their general recommendation that the police responsibility be scaled back:

The representatives present expressed a favorable view as to the need for this type [of] assistance by [a] spouse who is

---

11. The Committee consisted of representatives from the legislative committees of the Maryland Chiefs of Police Association, the Maryland Law–Enforcement Officers, Inc., the Maryland Sheriffs' Association, and the Maryland Municipal League.

a victim of violence and agreed with the general concept of the bill. . . . The Committee believed that the enactment of the bill in its present form would result in a severe manpower drain on police departments, which might result to the detriment of the general public in other matters urgently requiring police assistance. Another practical difficulty the police envisioned would be that juvenile authorities and social service agencies would not be available during the evening hours or weekends when action by these agencies would be necessary. The Committee felt that police participation in spousal violence situations is appropriate where violence exists, however, the remainder of the problem is one for social agencies. *The Committee would approve the concept of the bill but oppose some of the obligations imposed upon police departments by the bill.* [Emphasis added.]

Subsequently, House Bill 53 was amended to scale back the list of police responsibilities. The original version of the bill provided that a law enforcement officer would: (1) advise the victim with respect to available sources of shelter, medical care, counseling, and other services; (2) transport the victim to such facilities where appropriate; and (3) accompany the victim back to the family home to retrieve clothing and other personal effects. However, the only provision that survived the amending process was that, upon request, a police officer was to provide protection to a spouse who needed to return to the family home for the exclusive purpose of retrieving necessary personal property. In its final form, the title to House Bill 53 read as follows:

[For] the purpose of authorizing law enforcement officers to provide protection for victims of spousal assault and assistance in removing certain personal property from the family home; and providing immunity from liability for officers carrying out the provisions of this Act.

This final title clearly states the express purpose of House Bill 53 and limits its scope: to provide the authorization for certain police activity that otherwise may well have been beyond the scope of traditional police authority. The Legislature made a

conscious decision to amend House Bill 53 to limit its scope to only two precise sets of circumstances. The first was a duty already encompassed by a police officer's traditional role: to protect the victim of a crime occurring in the officer's presence. The second was newly created by the statute. In final form, the statute provided protection for victims of spousal assault and assistance in removing certain personal property from the family home.

As originally enacted Article 27, section 11F provided:

(a) *Assistance to victim.*—Any person who alleges to have been a victim of spousal assault and who believes there is a danger of serious and immediate injury to himself or herself may request the assistance of a local law enforcement agency. A local law enforcement officer responding to the request for assistance shall:

(1) Protect the complainant from harm when responding to the request; and

(2) Accompany the complainant to the family home so that the complainant may remove his or her personal clothing and effects and also the personal clothing and effects of any children that may be in the care of the complainant. The personal effects to be removed shall be only those required for immediate needs.

(b) *Immunity of law enforcement officer from civil liability.*—Any law enforcement officer responding to such a request shall be immune from civil liability in complying with the request as long as the officer acts in good faith and in a reasonable manner.

As indicated by both the express wording of the statute and the evolution of House Bill 53, as initially enacted, the exclusive concern of Article 27, section 11F was to authorize a law enforcement officer to render assistance to a victim of spousal abuse. The Legislature was very precise in defining what the "assistance" was limited to, because subsections (a)(1) and (a)(2) expressly direct what the officer shall do in "responding to the request for assistance." Section 11F clearly dealt with two very narrow and limited situations. As we have indicated,

the first one protecting complainants from harm during the officer's response legislated what was always an obligation of the officer. The second imposed a new obligation on the officer, to protect the complainant who is returning to retrieve items from the home or attempting to leave with such items, during that process. This last function appears to have been the primary purpose of the original statute.

1994 Maryland Laws, Chapter 728 (the Domestic Violence Act of 1994) provided the first significant change to Article 27, section 11F by expanding the class of persons who were entitled to the assistance of the law enforcement officer.[12] As originally enacted, the law only extended special assistance to a person who alleged that he or she had been "a victim of spousal assault." 1994 Maryland Laws, Chapter 728 broadened the class of persons entitled to assistance under section 11F to include "victim[s] of abuse." During this expanding of the class of protected people, the Act modified the subtitle of section 11F from "Spousal Assault" to "Domestic Abuse." [13] A "victim" was, in turn, defined as a "person eligible for relief" under Maryland Code (1984, 1991 Repl.Vol., 1997 Cum.Supp.), section 4–501 of the Family Law Article, which provides basic definitions in the context of domestic violence. 1997 Maryland Laws, Chapter 315 further amended this section "[for] the purpose of clarifying that when a law enforcement officer is required to accompany an alleged victim of domestic abuse to the family home so that the victim may remove the personal effects of certain persons, the personal effects include certain medicines or medical devices; authorizing the complainant to remove certain items regardless of who paid for the items;

---

12. There have been two other relatively minor changes made to section 11F. First, there was a re-wording with respect to the "personal clothing" and "personal effects," which the alleged victim was permitted to remove from the family home. Second, in 1979, section 11F expressly spelled out the immunity provision, whereas by 1995 it simply made reference to § 5–326 of the Courts and Judicial Proceedings Article. Neither change affected the substance of section 11F.

13. This subtitle was changed to "Domestic Violence" by 1996 Maryland Laws, Chapter 585.

and generally relating to domestic abuse and the duties of law enforcement officers." Section 11F, now codified as section 798 of Article 27, remains a statute with a very limited scope. Its evolution over the past two decades has only: (1) broadened the classification of people who warranted this protection and (2) clarified the nature of the personal items allowed to be taken from the home. As it is currently drafted, Article 27, section 798, titled "Duties of law enforcement officers—domestic abuse" states in relevant part:

(b) *Assistance to victim.*—(1) Any person who alleges to have been a victim of abuse and who believes there is a danger of serious and immediate injury to himself or herself may request the assistance of a local law enforcement agency.

(2) A local law enforcement officer responding to the request for assistance shall:

(i) Protect the complainant from harm when responding to the request; and

(ii) Accompany the complainant to the family home so that the complainant may remove the following items, regardless of who paid for the items:

1. The personal clothing of the complainant and of any child in the care of the complainant; and

2. The personal effects, including any medicine or medical devices, of the complainant and of any child in the care of the complainant that are required for the immediate needs of the complainant or the child.

(c) *Immunity of law enforcement officer from civil liability.*—Any law enforcement officer responding to such a request shall have the immunity from liability described under § 5–610 of the Courts Article.

Maryland Code (1957, 1996 Repl.Vol., 1999 Cum.Supp.), Art. 27, § 798. There is nothing in the plain language of the statute and nothing in its legislative history that evidences any intent by the Legislature to mandate around-the-clock personal protection *ad infinitum* for persons who are complainants, i.e., victims, under that act. In so stating, we do not mean to

say that, given the experience of the courts with the issue of domestic violence, such protection is not warranted in many cases. Such a mandate, however, must come, if it is to come, from the legislative or executive branches. The other two departments are better able to assess the problems and the costs of providing such extended protection. It is clear to this Court that the Legislature did not intend to create such a heightened level of protection in passing the statute at issue in this case. As we have said, the plain wording of Maryland Code (1957, 1996 Repl.Vol., 1999 Cum.Supp.), Article 27, section 798, supported by its legislative history, limits its applicability to a distinct set of circumstances: a law enforcement officer must protect the alleged victim of domestic abuse from harm when responding to a request to accompany the alleged victim of domestic abuse to the family home so that he or she may recover personal clothing and personal effects, including any medicine or medical devices.

It is evident from reviewing the legislative history of section 798, that in the context of domestic violence, two closely related sets of circumstances were of great concern with respect to the responsibility of the police to take some action and the authority of the police to take action. The two sets of circumstances that were primarily addressed were: (1) when the feuding parties were still inside the family home, but someone had called for assistance and (2) where one of the parties had left the family home and re-entry was desired, but risked potential peril. An officer, of course, could always make a warrantless arrest for a crime, including an assault or abuse, committed in his presence. Beyond that, however, the police authority to intervene in a family fight was highly problematic. Unless an officer had probable cause to believe that a felony had been committed, once the violence had actually subsided, the aggrieved party, out on the street or otherwise, was generally left with no recourse but to go to the District Court and apply for a warrant of arrest. The police officer was powerless to help.

The first mandate of section 798, as we have noted, simply authorized the police officer, under the protec-

tion of immunity, to provide protection in a domestic violence situation where both parties are present. In the present case, when Officer Colbert answered a domestic call at the victims' home, the alleged attacker was not present. Thus, the first requirement of section 798 is inapplicable to the facts of the case *sub judice*. As we have said, it is clear that the intent of the Legislature in enacting section 798 clearly was not to create a duty to protect the victim for an indefinite amount of time: it was only to provide protection while responding to the request. When Officer Colbert responded to the request for assistance, he was not initially put in a situation where it was necessary to provide protection to Valerie Williams because Gerald Watkins was not present at the time. The argument that once Officer Colbert arrived on the scene, he had an affirmative duty to protect Valerie Williams from all possible threats of domestic violence for an indefinite period is incorrect, and not supported by the plain language of the statute or by its legislative history.[14] Section 798 creates a duty to protect a victim of domestic violence only where a clear, imminent threat exists during the officer's response. The second mandate of section 798 is equally inapplicable to the facts of the present case. It provides the police with the authority, and requires them, to accompany and to protect the victim of abuse when returning to the family home for the limited purpose of retrieving clothing and other personal effects required for immediate needs.[15] Clearly this mandate

---

14. As noted by Judge Moylan in the Court of Special Appeals,

> [a] continuing victim protection program is clearly not provided by [section 798] and is self-evidently not feasible. How long would it last? An hour? A day? A week? A year? Would it involve three shifts of police officers a day, even before provision is made for weekend coverage? Would it apply only at home? Or at work? Or in moving about the city? The concept is absurd. The direction to "[p]rotect the complainant from harm" is qualified by the temporal limitation "when responding to the request for assistance."

*Williams*, 128 Md.App. at 25 n. 6, 736 A.2d at 1097 n. 6 (third alteration in original).

15. Under the appropriate set of facts, Valerie Williams could have been within the ambit of persons entitled to police assistance in retrieving personal effects. Prior to 1994, she would not have been so entitled,

does not apply to the facts of the case. Valerie Williams was never forced from a home she shared with Watkins nor did she need to re-enter premises where Gerald Watkins might be present. She was in her parent's home, where she resided. There was no need to recover any personal clothing or effects.

It is clear from the statute that it is limited to an officer who is responding to a complaint of domestic violence where the violence continues in the officer's presence, and an officer who is accompanying a person to recover personal effects. Only in those two limited capacities is there a duty to protect created by the statute at issue. It was not the intent of the Legislature to create a permanent personal bodyguard for any person who claims abuse. Officer Colbert was neither divested of discretion nor was he mandated by section 798 to protect petitioners forever. Even looking in a light most favorable to Mrs. Williams, section 798 is inapplicable to the facts of the present case. Concerning this issue, there is no genuine dispute of material fact; therefore the trial court's granting of summary judgment as to petitioners' claim concerning section 798 was appropriate.

Petitioners also contend that Baltimore City Police Department General Order 10–93 divested Officer Colbert of discretion, and mandated that he protect petitioners. We disagree with this assertion as well. Baltimore City Police Department General Order 10–93 states in relevant part:

Subject: *Domestic Incidents—Reporting/Arrest Criteria*
*POLICY*

It is the long-standing policy of the Baltimore Police Department to fully investigate and accurately report all *domestic incidents* coming to our attention, specifically domestic assaults; to arrest offenders where lawful and appro-

---

for she was not and never had been the legal spouse of Gerald Watkins. Her entitlement to such assistance under the post–1994 expanded coverage would have only been by virtue of the fact that she was, as of July 19, 1995, "an individual who ha[d] a child in common with" Gerald Watkins. Maryland Code (1984, 1999 Repl.Vol., 1999 Cum. Supp.), § 4–501(i)(6) of the Family Law Article.

priate; and where practicable, to inform involved parties of the various services that may be available to them within the Criminal Justice System, from social service agencies and other community resources.

*This directive was prepared in keeping with the values of the department: Our Highest Commitment is Protecting Life (protecting victims of domestic violence); We are Committed to Provide High Quality Public Service and We are Responsive to Community and Neighborhood Priorities (resolving domestic complaints)....*

## RESPONSIBILITIES

. . . .

2. Protect the victim of a *domestic incident* from physical harm.

We view General Order 10–93 in the same light as section 798, *supra,* i.e., it does not apply to the facts of the present case. As we stated in our analysis of section 798, Officer Colbert has a duty to protect a victim of domestic violence only from violence occurring in his presence. To require a law enforcement officer to protect a victim of domestic abuse from all potential future possibilities of domestic assault would be absurd. That could not have been the intention of the police department in drafting this order, and we are not prepared to create such a duty. Officer Colbert was neither divested of discretion nor was he mandated by General Order 10–93 to protect petitioners beyond the duties expressed by Article 27, section 798. Even looking in a light most favorable to Mrs. Williams, General Order 10–93 is inapplicable to the facts of the present case. Concerning this issue, there is no dispute of material facts; therefore the trial court's granting of summary judgment pursuant to petitioners' claims concerning General Order 10–93 was appropriate.

## B. Immunity

For the sake of organization and clarity, we shall save our discussion of "the special relationship exception," until after

we discuss statutory and common law immunity. Therefore, we now jump ahead and address petitioners' third question: Were Officer Colbert's actions at 622 Melville Avenue protected by either statutory or common law immunity?

We start our analysis by addressing whether Officer Colbert's actions were protected by statutory immunity. Maryland Code (1974, 1998 Repl.Vol.), section 5–507(b) of the Courts & Judicial Proceedings Article codifies the immunity provision for Maryland municipal public officials, including law enforcement officers. It states in relevant part:

(b) *Nonliability of officials generally* . . .— (A)n official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action.

As we discuss, *infra*, Officer Colbert, as a law enforcement officer, was an official of a government entity who, as we discussed, *supra*, was acting in the scope of his employment. Petitioners present no evidence that Officer Colbert acted with malice.[16] Generally, Officer Colbert, to the extent his actions were discretionary and not ministerial, falls under the purview of section 5–511(b) and qualifies for immunity from civil liability.

Additionally, Maryland Code (1974, 1998 Repl.Vol.), section 5–610 of the Courts & Judicial Proceedings Article, referenced in Article 27, section 798(c), *see supra*, states:

A law enforcement officer who responds to a request under Article 27, § 798 of the Code for assistance by an individual who alleges to have been a victim of spousal

---

16. The Court of Special Appeals defined what constitutes malice sufficient to defeat immunity in *Leese v. Baltimore County*, 64 Md.App. 442, 480, 497 A.2d 159, 179, *cert. denied*, 305 Md. 106, 501 A.2d 845 (1985), *overruled on other grounds by Woodruff v. Trepel*, 125 Md.App. 381, 725 A.2d 612 (1999):

The actual malice needed to defeat official immunity requires an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and wilfully injure the plaintiff. [Quotation omitted.]

assault shall be immune from civil liability in complying with the request if the law enforcement officer acts in good faith and in a reasonable manner.

As we discussed, *supra*, section 798 was inapplicable to petitioners' claim in the case *sub judice;* however, section 5–610 is still relevant to our analysis as it demonstrates the Legislature's intent to preserve a law enforcement officer's immunity under this new authorized duty.

Turning our attention back to House Bill 53, it is evident that the Legislature intended to insure that law enforcement officers would not lose their traditional immunity due to the new responsibility of accompanying a victim of domestic violence back into the family home to recover personal effects. By clearly including language in section 11F, and ultimately section 798, that a police officer retained immunity when acting in this capacity, the Legislature demonstrated a desire to preserve both the statutory immunity granted by section 5–511(b) of the Courts & Judicial Proceedings Article and the doctrine of common law immunity that we discuss, *infra.* The Legislature acted in an effort to quell the fear of state and local police organizations that, if police officers found themselves acting beyond the scope of normal police authority, nontraditional activity might divest them of the immunity ordinarily available to governmental officials acting with conferred discretion in the course of their employment.

On February 22, 1979, Baltimore County Assistant State's Attorney Stephen Montanarelli, testifying before the House Judiciary Committee in support of House Bill 53, specifically addressed the problem that there was no legal basis at the time for the police to accompany a spouse back to the family home and that such an action might, therefore, be beyond the scope of police authority:

> [It is] discretionary for police in Baltimore County to accompany [a] spouse to get [his or her] clothes. This bill would give [the] spouse a right to have police accompany [him or] her.

[There is] [*n* ]o *legal basis for police to accompany* [*a* ] *spouse now.* If [a] woman says she was threatened, there is an assault. An assault is a misdemeanor. Police cannot arrest for a misdemeanor unless [they] observe[ ][a] misdemeanor. Therefore, [the man or] woman must swear out [a] warrant. [Emphasis added.]

The February 2, 1979 letter from the Joint Police Committee to Delegate Owens, Chairman of the House Judiciary Committee, similarly referred to the lack of statutory authority for the police to provide certain types of assistance to spousal assault victims: "Some of the services set forth in the bill to be performed by police are at the present time being performed *despite the lack of specific statutory authority.*" (Emphasis added.)

Similarly, in her February 22, 1979 testimony before the House Judiciary Committee, Katherine Foss, of the Prince George's County Department of Social Services stated:

Emergency Shelter staff find that the police are powerless to offer much assistance. They are *reluctant to accompany the woman to her home, claiming lack of authority* or that it is not part of their job. The police cannot arrest an abusing husband unless he actually witnesses the abusive incident. [Emphasis added.]

We also note an important change in the title clause, and in House Bill 53 itself. The original title to the bill made no mention of the immunity provisions contained within the proposed legislation. That immunity provision would have cross-referenced another immunity statute already codified in Article 27: "(e) The same provisions regarding immunity and costs under Article 27, § 35A shall apply to assistance rendered to children or a victim of spousal violence pursuant to this statute." *See* 1979 Md. Laws, Chap. 307. Apparently, after the law enforcement community expressed its concerns to the General Assembly, proposed subsection (e) was stricken (along with the rest of the original proposed statute) and a new, self-inclusive immunity provision added in subsection (b) of the new proposed statute. In addition, the title was amended to

reference that immunity provision specifically: "[For] the purpose of . . . providing immunity from liability for officers carrying out the provisions of this Act." From the start, this legislative history reflects that, although the Legislature intended to expand police duties, it by no means intended to create any statutorily based liability. The changes made to the legislation indicate that the Legislature wanted to make this point all the more clear.

■ We agree with Judge Moylan's conclusion in the Court of Special Appeals opinion:

If the police were acting without statutory authority, there might arguably be some cloud on their entitlement to public official immunity. The double-barreled legislative response was 1) to provide the statutory authority and 2) to make certain that there was immunity.

We hold that in enacting the immunity provision of [1979 Maryland Laws, Chapter] 307, it clearly was not the legislative intent to diminish or to curtail in any way the qualified immunity otherwise enjoyed by a law enforcement officer as a governmental official. It was, rather, the clear and sole intent of that provision, probably redundantly, to make doubly certain that police officers, called upon by the Act to perform an arguably extraordinary function beyond the scope of their routine duties, would not unintentionally be stripped of their accustomed immunity. The mathematical function which the Legislature intended to apply to public official immunity was addition, if necessary, and not subtraction.

*Williams*, 128 Md.App. at 28–29, 736 A.2d at 1098–99 (footnote omitted). In keeping with this conclusion, we hold that mere negligence, i.e., not acting in a reasonable manner, does not defeat public official immunity in the context of section 798.

■ Because Officer Colbert has demonstrated that he is generally protected by statutory immunity for his actions at 622 Melville Avenue, we now turn our attention to a discussion of the general immunity from civil liability that police officers are granted by common law. This grant of immunity is often

referred to as "the public duty doctrine," "the no-duty rule," or more precisely as the "duty to all, duty to no one doctrine." *See* J.C. McMillan Jr., *Government Liability and the Public Duty Doctrine,* 32 Vill. L.Rev. 505, 509 (1987); *Police Liability for Negligent Failure to Prevent Crime,* 94 Harv. L.Rev. 821, 822 (1981). This doctrine provides "that a municipality's duty to provide police protection ordinarily is one owed to the public-at-large and not to a specific person or class." *Kircher v. City of Jamestown,* 74 N.Y.2d 251, 256, 544 N.Y.S.2d 995, 543 N.E.2d 443, 445 (1989). It applies to the discretionary actions of public officials. It does not apply to public officials' ministerial acts.

As early as 1856, the United States Supreme Court, in a case on an official bond, recognized that, although law enforcement officers have a general duty to protect the public as a whole, they are not liable for failure to protect specific individuals. *See South v. Maryland ex rel. Pottle,* 59 U.S. (18 How.) 396, 15 L.Ed. 433 (1856). In that case, the initial plaintiff was allegedly imprisoned for a four-day period and not released until he paid $2,500.00.[17] During his alleged captivity, plaintiff asked Daniel South, the Washington County Sheriff, for assistance and protection. The plaintiff sued Sheriff South in the United States District Court in Maryland saying that the Sheriff's failure to protect and relieve him was a breach of his duty to keep the peace of the State of Maryland. The Court noted:

> This declaration ... assumes as a postulate that every breach or neglect of a public duty subjects the officer to a civil suit by any individual who, in consequence thereof, has suffered loss or injury; and consequently, that the sheriff and his sureties are liable to this suit on his bond, because

---

**17.** "The breach alleged is, in substance, 'that while Pottle was engaged about his lawful business, certain evil-disposed persons came about him, hindered and prevented him, threatened his life, with force of arms demanded of him a large sum of money, and imprisoned and detained him for the space of four days; and until he paid them the sum of $2,500 for his enlargement.'" *Id.* at 401, 725 A.2d 612.

he has not "executed and performed all the duties required of and imposed on him by the laws of the State." *Id.* at 401. The trial court found for the plaintiff but the Supreme Court reversed, concluding:

It is a public duty, for neglect of which [public officials are] amenable to the public, and punishable by indictment only.

The history of the law for centuries proves this to be the case. Actions against the sheriff for a breach of his ministerial duties in the execution of process are to be found in almost every book of reports. But no instance can be found where a civil action has been sustained against him for his default or misbehavior as conservator of the peace, by those who have suffered injury to their property or persons through the violence of mobs, riots, or insurrections.

*Id.* at 403.

Maryland's public duty doctrine also has its origins in the nineteenth century. In 1898, this Court first recognized the need to protect a law enforcement officer from civil liability where a negligence claim arose out of the judgment and discretion needed to perform that job properly. *Cocking v. Wade*, 87 Md. 529, 40 A. 104 (1898). In that case, Joseph Cocking had been indicted by the grand jury of Charles County for the murder of his wife and sister-in-law. He was placed in the custody of Charles County Sheriff George A. Wade. Due to fear of mob violence against him, Cocking was moved several times, first to a jail in Baltimore City, then back to Charles County into a dilapidated building, that had previously been used as a jail. Cocking's request for a change of venue to St. Mary's County was granted and caused an increase in the civil unrest in Charles County. Despite repeated requests by Cocking and his counsel, Sheriff Wade refused to relocate the prisoner to a safer jail. A short time later, a group of unknown men attacked the jail, took Cocking from his cell, and hanged him. Cocking's children proclaimed their father's innocence and brought a claim against Sheriff Wade for his negligence in performing the basic duty of protecting a prisoner. We held that they did not have a cause

of action. Relying in large part on the Supreme Court's decision in *South v. Maryland,* we said:

How [a sheriff shall perform his duties] may often be a matter of great difficulty, and one calling for the exercise of much judgment and high degree of courage. He will be required to take careful account of all the circumstances that surround him; estimate, in cases of outside attack the forces he must encounter, and compare them with his means of defen[s]e, and after due deliberation determine what course is best for him to pursue. If he does this honestly, with a full purpose to perform his whole duty, even though he make a mistake, whereby a prisoner is injured, it would be monstrous to hold him civilly responsible for damages to such prisoner. *"A public officer is not liable to an action, if he falls into error in a case where the act to be done is not merely a ministerial one, but is one in relation to which it is his duty to exercise judgment and discretion, even though an individual may suffer by his mistake.* A contrary principle would indeed be pregnant with the greatest mischief." *Kendall v. Stokes,* 3 Howard 98; *Sherman and Redfield on Negligence,* sec. 156, and authorities cited. So also he must detain his prisoner in the common jail, unless some necessity makes it proper to remove him; but it is his province to determine when such necessity has arrived; and if in the honest exercise of his discretion, he fails to remove him in time to avert a prospective danger, *he cannot be held civilly responsible.*

*Id.* at 541, 40 A. at 106 (emphasis added).

 This general rule has evolved into a standard, "which we have applied to tort claims against a governmental representative is that the actor will be relieved of liability for his *non-malicious* acts where: (1) he 'is a *public official* rather than a mere *government employee or agent;* and (2) his tortious conduct occurred while he was performing *discretionary,* as opposed to *ministerial,* acts in furtherance of his official duties.'" *Ashburn v. Anne Arundel County,* 306 Md. 617, 622, 510 A.2d 1078, 1080 (1986) (quoting *James v. Prince George's County,* 288 Md. 315, 323, 418 A.2d 1173, 1178 (1980)

(emphasis in original)); [18] *Robinson v. Board of County Comm'rs,* 262 Md. 342, 346–47, 278 A.2d 71, 74 (1971); *Duncan v. Koustenis,* 260 Md. 98, 104, 271 A.2d 547, 550 (1970); *Clark v. Ferling,* 220 Md. 109, 113–14, 151 A.2d 137, 139 (1959). As we concluded in *James,* 288 Md. at 323–24, 418 A.2d at 1178:

> Once it is established that the individual is a public official *and* the tort was committed while performing a duty which involves the exercise of discretion, a qualified immunity attaches; namely, in the absence of malice, the individual involved is free from liability. The rationale underlying this grant of immunity "is that a public purpose is served by protecting officials when they act in an exercise of their discretion." [Citations omitted.]

Maryland case law has affirmatively established that, while performing their duties, law enforcement officers are public officials and, thus, fall within the scope of qualified immunity as to their discretionary acts. They have no immunity in respect to ministerial acts. *Clea v. Mayor & City Council of Baltimore,* 312 Md. 662, 672, 541 A.2d 1303, 1308 (1988) ("In Maryland, a limited category of governmental personnel, *including police officers,* are entitled under certain circumstances to qualified immunity from tort liability for their negligent conduct." (emphasis added)); *Bradshaw v. Prince George's County,* 284 Md. 294, 302–03, 396 A.2d 255, 260–61 (1979) ("*We have held that a police officer is a 'public official' when acting within the scope of his law enforcement function.* As a 'public official,' a police officer is protected by a qualified immunity against civil liability for non-malicious acts performed within the scope of his authority." (emphasis added) (citations omitted)); *Cox v. Prince George's County,* 296 Md. 162, 168–69, 460 A.2d 1038, 1041 (1983) ("[A] police officer

---

18. *James* was superseded in part by *Prince George's County v. Fitzhugh,* 308 Md. 384, 519 A.2d 1285 (1987), due to an amendment to section 1013 of the Prince George's County charter concerning actions for which the county may be sued. This superseding has no effect on the general rule espoused in *James,* as relevant to this case. *See Fitzhugh,* 308 Md. at 388–89, 519 A.2d at 1287.

would not be personally liable for negligent conduct committed within the scope of employment due to his public-official immunity."); *Brewer v. Mele,* 267 Md. 437, 444, 298 A.2d 156, 161 (1972) ("Some jurisdictions make the immunity of the law enforcement officer absolute, provided only that he be acting within the scope of his official duties. Others, including Maryland, condition the immunity upon nonmalicious conduct." (footnote omitted)), *superseded by statute on other grounds as stated in Shoemaker v. Smith,* 353 Md. 143, 725 A.2d 549 (1999); *Robinson,* 262 Md. at 346–47, 278 A.2d at 74 ("In Maryland governmental immunity is extended to all nonmalicious acts of public officials * * * when acting in a discretionary * * * capacity.... *It is clear that policemen are public officials.*" (quotations omitted) (emphasis added)).

The next issue we must address is whether Officer Colbert was acting in a discretionary manner. As indicated by our analysis of section 798 and the Baltimore City Police Department General Order 10–93, *supra,* he was not divested of discretion. As we said in *Ashburn,* 306 Md. at 623, 510 A.2d at 1081:

> In addressing the difference between discretionary and ministerial actions, our predecessors noted in *Schneider v. Hawkins,* 179 Md. 21, 25, 16 A.2d 861, 864 (1940):
>
>> The term "discretion" denotes freedom to act according to one's judgment in the absence of a hard and fast rule. When applied to public officials, "discretion" is the power conferred upon them by law to act officially under certain circumstances according to the dictates of their own judgment and conscience, and uncontrolled by the judgment or conscience of others.
>
> Almost any action, however, may involve the use of discretion. Thus, we noted in *James, supra,* 288 Md. at 327, 418 A.2d at 1180:
>
>> When attempting to classify the particular actions of a public official, a court should be careful not to let the mere fact that decisions are made in performing the questioned task be determinative of whether liability at-

taches to the conduct, for "[i]n a strict sense, every action of a government employee, except perhaps a conditioned reflex action, involves the use of some degree of discretion." *Swanson v. United States*, 229 F.Supp. 217, 219–20 (N.D.Cal.1964). Or as has been otherwise expressed: "it would be difficult to conceive of any official act, no matter how directly ministerial, that did not admit of some discretion in the manner of its performance, even if it involved only the driving of a nail." *Johnson v. State*, 69 Cal.2d 782, 447 P.2d 352, 357, 73 Cal.Rptr. 240 (1968) (en banc). *Thus, an act falls within the discretionary function of a public official if the decision which involves an exercise of his personal judgment also includes, to more than a minor degree, the manner in which the police power of the State should be utilized.* [Emphasis supplied.]

Officer Colbert's actions at 622 Melville Avenue on July 19, 1995 were discretionary in nature. The record reflects that Officer Colbert's actions while responding to the domestic violence complaint were in conjunction with the standards required of a Baltimore Police Officer. He took statements from both Mary and Valerie Williams; upon learning of Gerald Watkins whereabouts, he requested that another police unit be sent to that location; and he called for a camera to photograph Valerie Williams' injuries. Pursuant to a separate mandate of Baltimore City Police Department General Order 10–93, one of the responsibilities of a police officer responding to a domestic call is to "[h]ave the injuries photographed by the Mobile Crime Lab in cases of serious or obvious injury to the victim." When no other police units brought the camera, he decided to go to the station himself. Ordinarily, he would have discretion to do so. Having told them, however, to go into the house and that he would remain, a duty may have existed to tell them that he was leaving.

To summarize, there are three prongs that must be satisfied in order for a government representative to qualify for immunity: (1) he or she must be a *public official;* and (2) his or her tortious conduct must have occurred while performing *discre-*

*tionary* acts in furtherance of official duties; and [19] (3) the acts must be done without malice. That being said we turn to the facts of the present case. As Judge Moylan astutely summarized for the Court of Special Appeals:

> When Officer Colbert responded to the domestic violence call at 622 Melville Avenue on July 19, 1995, he indisputedly was a government official exercising a portion of the sovereign power of the State. He indisputedly was acting within the scope of his employment and, therefore, performing a discretionary act. There was, moreover, no remote suggestion that he was acting or failing to act with any sort of actual malice, with evil or rancorous motive influenced by hate, or with the purpose deliberately and wilfully to injure [petitioners].

*Williams,* 128 Md.App. at 19, 736 A.2d at 1094.

### C. Special Relationship

██ Petitioners also contend that Officer Colbert's affirmative actions and specific promises of protection to Mary and Valerie Williams, which, they assert, were reasonably relied upon by them to their detriment, created a special relationship between him and Mary and Valerie Williams that eliminates his right to immunity. We, at the very least, agree that under the peculiar circumstances testified to by Mary Williams, there may be a genuine dispute of material fact concerning whether a special relationship existed between the two parties, thereby creating a duty of protection on the part of Officer Colbert. Concerning this issue, the granting of the summary judgment motion was inappropriate: the issue as to whether a special relationship existed, when there is a dispute of material fact, is a decision for the finder of fact.

It is important for us to remember that petitioners allege that Officer Colbert was negligent in the performance of his duties in responding to this domestic complaint. Under the

---

**19.** We emphasize that the holdings of a long line of Maryland cases limit public official immunity to discretionary acts. Public official immunity does not, in the first instance, apply to ministerial acts.

circumstances of this case, a claim for negligence will only stand if Officer Colbert actually owed petitioners a legal duty to protect, which he breached. As we noted in *Ashburn,* 306 Md. at 626–29, 510 A.2d at 1082–84:

Judge McSherry stated for this Court over eighty years ago that:

there can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another. It is consequently relative and can have no existence apart from some duty expressly or impliedly imposed. In every instance, before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which duty would have averted or avoided the injury.... As the duty varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or in fact, if there has been no breach of duty.

Judge McSherry's comments remain viable today: negligence is a breach of a duty owed to one, and absent that duty, there can be no negligence.

"Duty" in negligence has been defined as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." There is no set formula for this determination. As Dean Prosser noted, "duty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." In broad terms, these policies include: "convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, [and] the moral blame attached to the wrongdoer...." As one court suggested, there are a number of variables to be considered in determining if a duty exists to another, such as:

the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the close-

ness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

Perhaps among these the factor deemed most important is foreseeability. However, "foreseeability" must not be confused with "duty." The fact that a result may be foreseeable does not itself impose a duty in negligence terms. This principle is apparent in the acceptance by most jurisdictions and by this Court of the general rule that there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a "special relationship" exists either between the actor and the third person or between the actor and the person injured.

Thus, we recognize the general rule, as do most courts, that absent a "special relationship" between police and victim, liability for failure to protect an individual citizen against injury caused by another citizen does not lie against police officers. Rather, the "duty" owed by the police by virtue of their positions as officers is a duty to protect the public, and the breach of that duty is most properly actionable by the public in the form of criminal prosecution or administrative disposition. As the District of Columbia Court of Appeals stated in *Morgan v. District of Columbia, supra*, 468 A.2d [1306,] 1311 [ (D.C.1983) ]:

> public officials who act and react in the milieu of criminal activity where every decision to deploy law enforcement personnel is fraught with uncertainty must have broad discretion to proceed without fear of civil liability in the "unflinching discharge of their duties." As the Connecticut Supreme Court recognized the public interest is not served "by allowing a jury of lay (persons) with the benefit of $^{20}/_{20}$ hindsight to second-guess the exercise of a police [officer]'s discretionary professional duty. Such

discretion is no discretion at all." [Numerous citations omitted.] [Some alterations in original.]

As evidenced in the wording of *Ashburn*, Maryland recognizes that liability for failure to protect an individual citizen against injury caused by another citizen, where the officer is performing a discretionary act, does not lie against an officer, *absent a "special relationship."* In the presence of a "special relationship" liability may lie and immunity may not survive. Thus, "[t]he public duty doctrine ... is not an absolute bar to recovery." McMillan, *supra*, at 514. As we continued in *Ashburn*:

A proper plaintiff, however, is not without recourse. If he alleges sufficient facts to show that the defendant policeman created a "special relationship" with him upon which he relied, he may maintain his action in negligence. *See Restatement (Second ) of Torts* § 315(b).[20] This "special duty rule," as it has been termed by the courts, is nothing more than a modified application of the principle that although generally there is no duty in negligence terms to act for the benefit of any particular person, when one does indeed act for the benefit of another, he must act in a reasonable manner. *See Scott v. Watson, supra,* 278 Md. [160] at 170–71, 359 A.2d [548] at 555 [1976]; *Penn. R.R. Co. v. Yingling,* 148 Md. 169, 129 A. 36 (1925). *In order for a special relationship between police officer and victim to be found, it must be shown that the local government or the police officer affirmatively acted to protect the specific victim or a specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the police protection. See Williams v. State,* 34 Cal.3d 18, 192 Cal.Rptr. 233, 664

---

**20.** Restatement (Second) of Torts, § 315 (1965) states:

There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

 (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

 (b) a special relation exists between the actor and the other which gives to the other a right to protection.

P.2d 137, 140 (1983); *Morgan v. District of Columbia,* *supra,* 468 A.2d at 1313–15; *Florence v. Goldberg,* 44 N.Y.2d 189, 196–97, 404 N.Y.S.2d 583, 587, 375 N.E.2d 763, 767 (1978); *Morris v. Musser, supra,* [84 Pa.Cmwlth. 170, ]478 A.2d [937] at 940 [1984]; *Chambers–Castanes v. King County,* 100 Wash.2d 275, 669 P.2d 451, 458 (1983).

*Ashburn,* 306 Md. at 630–31, 510 A.2d at 1085 (emphasis added).

Maryland has considered what was meant by the term "special relationship" on several occasions. In *Ashburn,* an Anne Arundel County police officer noticed an intoxicated man sitting behind the wheel of a truck with its engine running, in the parking lot of a 7–11 convenience store. The parties agreed that the man was driving the vehicle and that the officer could have arrested the man for drunk driving. Instead of charging the man, the police officer told him to pull his car to the side of the lot and to stop driving for the evening. Once the officer left the scene, the man drove off and proceeded to hit a pedestrian, John F. Ashburn, who lost his leg in the collision. Ashburn sued the Anne Arundel County Police Department alleging that the officer had a special duty to protect Ashburn. We disagreed, saying that Ashburn "alleged no facts which show that [the police officer] affirmatively acted specifically for [Ashburn's] benefit or that [the officer's] actions induced [Ashburn's] reliance upon him." *Ashburn,* 306 Md. at 631–32, 510 A.2d at 1085. In other words, no special relationship ever existed between the officer and Ashburn.

Prior to *Ashburn,* this Court considered whether a special relationship existed between the parents of a child seriously injured by a drunk driver and the drunk driver's probation officer who had failed to report previous alcohol related driving offenses to the supervising court. *Lamb v. Hopkins,* 303 Md. 236, 492 A.2d 1297 (1985). In that case, the parents argued that the probation officer owed them a duty, which he breached, under the theory that he had taken charge of an individual with dangerous propensities and, therefore, had a duty to use reasonable care in preventing the individual from

doing such harm. *See* Restatement (Second) of Torts, § 319 (1965).[21] We held that no special relationship existed because the probation officer never took charge of the individual in a manner that would create a duty to protect third parties. *Id.* at 253, 492 A.2d at 1306; *see also Holson v. State,* 99 Md.App. 411, 414, 637 A.2d 871, 872 (1994) (holding, in a case where a police officer took a drunk driver into custody, leaving a passenger at the traffic stop, who then walked home and was struck by an automobile, that "[g]enerally, there is no duty, or special relationship creating any such duty, requiring police officers to transport intoxicated passengers of arrested drivers to their ultimate destination, or any destination."); *Jones v. Maryland–National Capital Park & Planning Comm'n,* 82 Md.App. 314, 332, 571 A.2d 859, 868 (holding, in a case where a police officer failed to properly detain an intoxicated driver who fled the scene and caused an accident, that "no 'special relationship' arises out of either an investigatory traffic stop or its resulting brief detention."), *cert. denied,* 320 Md. 351, 578 A.2d 191 (1990).

Looking at other jurisdictions, we have discovered that, although courts have found special relationships under a variety of circumstances, a court is generally more likely to find such a relationship when the police have taken some affirmative action. A number of our sister states have developed a series of questions in order to determine whether a special relationship exists.

In 1987, the Court of Appeals of New York considered the special relationship exception to public official immunity in *Cuffy v. City of New York,* 69 N.Y.2d 255, 513 N.Y.S.2d 372, 505 N.E.2d 937 (1987).[22] In that case, Joseph and Eleanor

---

**21.** Restatement (Second) of Torts, § 319 provides:
 One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

**22.** New York also provides us with two cases, with facts similar to the present case, in which the courts found a special relationship existed.

Cuffy owned a two-family house. They lived in the upstairs apartment with their family and rented the downstairs to Joel and Barbara Aitkins for approximately a year. The relationship between the two parties was strained and the police had to intervene on several occasions. Due to Joel Aitkins making

---

In *Velez v. City of New York,* 157 A.D.2d 370, 556 N.Y.S.2d 537, *appeal denied,* 76 N.Y.2d 715, 565 N.E.2d 1269, 564 N.Y.S.2d 718 (1990), a woman was shot and killed in her mother's apartment by her ex-boyfriend while she was in the protection of two New York City policemen. In the hours before her death, Ms. Velez and her three-month-old baby were abducted by her ex-boyfriend (and father of the child) from her mother's apartment and taken to the ex-boyfriend's apartment. There he tied her up and left his apartment. While he was gone, she managed to free herself from her bonds and call the police. The police arrived, drove around the neighborhood looking for the ex-boyfriend, and finally escorted Ms. Velez back to her mother's house where her ex-boyfriend lay in wait. He shot and killed Ms. Velez and immediately shot and killed himself. Concerning evidence of the special relationship, that court said, "were we to review [the municipality's] argument on the merits, we would hold that the evidence of a special relationship was not insufficient as a matter of law. Surely the requisite reliance on [Ms. Velez's] part arguably existed for at least as long as she was in police escort." *Id.* at 373, 556 N.Y.S.2d at 539.

In *DeLong v. County of Erie,* 60 N.Y.2d 296, 469 N.Y.S.2d 611, 457 N.E.2d 717 (1983), a special relationship was found based on a caller's reliance on promises of help from a 911 operator. On the morning of October 25, 1976, Amalia DeLong dialed 911 from her home in Kenmore, New York for emergency police assistance because a burglar was breaking into her home. She lived only blocks from the police station and the 911 operator told her the police were on the way. As a result of this assurance, Ms. DeLong elected to remain in her home. Unfortunately, the operator had misrecorded Ms. DeLong's address. After officers informed the 911 operator that they could not locate the house, the 911 operator told officers to disregard the request. The perpetrator then broke into her home and brutally murdered Ms. DeLong. The Court held that a special relationship may have existed based on two factors: (1) that the local government had encouraged her (and all victims of crime) to call 911 for emergency help; and (2) by saying that police were on the way, the operator made a promise, upon which Ms. DeLong relied. "Under similar circumstances it has been held that a special relationship was created so as to require the municipality to exercise ordinary care in the performance of a duty it has voluntarily assumed.... Whether a special duty has been breached is generally a question for the jury to decide." *Id.* at 305–06, 469 N.Y.S.2d 611, 457 N.E.2d at 721–22. These cases indicate that in circumstances when a person relies on the actions of a police officer, a special relationship may be found that eliminates a law enforcement officer's immunity and renders him or her civilly liable.

repeated threats to the Cuffy family, Joseph Cuffy went to the local police precinct requesting protection. The police assured Joseph Cuffy that protection would be supplied and something would be done about the situation first thing in the morning. The police took no further action and the next day a fight broke out between the families in which Joel Aitkins struck the Cuffy's son, Ralston, with a bat and Barbara Aitkins attacked Eleanor Cuffy and their other son, Cyril, with a knife. The family sued the police department alleging that a special relationship had been created between the police and the family based on the police officer's assurance of protection. Although the Court of Appeals of New York found no special relationship, it outlined the elements for defining a special relationship as follows:

(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking.

*Id.* at 260, 513 N.Y.S.2d 372, 505 N.E.2d at 940.

In 1983, the Superior Court for Pennsylvania similarly created a test for determining whether a special relationship exists in *Melendez v. City of Philadelphia*, 320 Pa.Super. 59, 466 A.2d 1060 (1983). In that case, a young boy was shot in the left eye by his neighbor during a racial confrontation. The victim and his parents sued the City of Philadelphia alleging that a special relationship existed because it had failed to protect sufficiently citizens from racial violence. That court initially noted:

Generally, it is acknowledged that there is no duty resting on a ... governmental body to provide police protection to any particular person. However, where the circumstances establish a "special relationship" ... then an exception to the general rule will be found and an affirmative duty to act will be imposed....

> ... A special relationship is generally found to exist only in cases in which *an individual* is exposed to a special danger and the authorities have undertaken the responsibility to provide adequate protection for *him.*

*Id.* at 64, 466 A.2d at 1063. Melendez had argued that the city had created such a special relationship because it had given assurances of protection to the residents of the neighborhood. The Pennsylvania court rejected his contention and then noted:

> [T]he rule almost universally recognized is that the individual claiming a "special relationship" must demonstrate that the police were: *1) aware of the individual's particular situation or unique status, 2) had knowledge of the potential for the particular harm which the individual suffered, and 3) voluntarily assumed, in light of that knowledge, to protect the individual from the precise harm which was occasioned.*

*Id.* at 65, 466 A.2d at 1063–64 (some emphasis added).

In *Chambers–Castanes v. King County,* 100 Wash.2d 275, 669 P.2d 451 (1983), the Supreme Court of Washington also outlined a set of questions designed to determine the existence of a special relationship. This case involved a police department's failure to respond to repeated emergency calls to 911 to report an assault in progress. The court implemented the following test:

> In determining whether an act falls within the [special relationship] exception, the court must consider the following four questions:

> (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental

agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Id.* at 281 n. 2, 669 P.2d at 456 n. 2 (quoting *Evangelical United Brethren Church v. State,* 67 Wash.2d 246, 407 P.2d 440 (1965)).

We believe that the intent of the "special relationship" doctrine is better addressed by our general standard outlined in *Ashburn:*

In order for a special relationship between police officer and victim to be found, it must be shown that the local government or the police officer affirmatively acted to protect the specific victim or a specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the police protection.

*Ashburn,* 306 Md. at 631, 510 A.2d at 1085. Under *Ashburn,* a determination of whether a special relationship exists is to be done on a case-by-case basis. Because it is evident, when a dispute of material fact exists, that the determination as to whether a special relationship exists lies with the trier of fact, we refrain from resolving whether such a relationship exists in the present case. We have, however, determined that, in the case *sub judice,* there is a genuine dispute of a material fact. Officer Colbert stated in his deposition that he told Mary Williams that he was waiting to see if anybody was available to bring him a camera, and that, at that time, he called again and learned that there was nobody available to bring him one. He stated in his deposition that he then told Mary Williams that he had to go get the camera himself, and she responded by saying that was fine. That is substantially different than Mary Williams' account of what happened. According to her deposition, Officer Colbert told her that he had to write his report and that she was to go in the house, because he was going to remain outside. While the officer may have had no duty to remain, if in fact he told Mrs. Williams that he would remain to protect them, he may have created a special rela-

tionship further creating a duty either to remain or to inform them that he was leaving. Whose story is more accurate is an issue of credibility and is a responsibility best left to the trier of fact. We do not mean to suggest an appropriate resolution of this dispute. We merely acknowledge that there is a genuine dispute of material fact as to the stories of the witnesses and based on those differences a finder of fact could find that a special relationship did exist between the parties. Therefore, the granting of respondent's summary judgment motion was inappropriate. Accordingly, we reverse the holding of the Court of Special Appeals, vacate the motion for summary judgment granted by the Circuit Court for Baltimore City and remand this case back to that court for a trial.

### III. Conclusion

We hold that Officer Colbert was not divested of discretion nor mandated by Article 27, section 798(b)(2), and Baltimore City Police Department General Order 10–93 to protect petitioners under the specific circumstances that evolved in this case. We also hold that, generally, a police officer has immunity from civil liability for negligence when he is performing a discretionary duty (although not while performing a ministerial act), absent a special relationship; however, we hold that Officer Colbert's affirmative actions and specific promises of protection to Mary and Valerie Williams, if in fact they occurred, are sufficient to have created a special relationship between himself and Mary and Valerie Williams. This special relationship, if it existed, may have created a duty of protection on the part of Officer Colbert. If so, his actions at 622 Melville Avenue may not warrant protection under either statutory or common law immunity. Accordingly, we reverse the decision of the Court of Special Appeals and remand to vacate the order of the Circuit Court for Baltimore City granting Officer Colbert summary judgment.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AS TO THE ISSUES INVOLVING OFFICER COLBERT REVERSED; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO VA-**

CATE THE GRANTING OF OFFICER COLBERT'S MO-
TION FOR SUMMARY JUDGMENT AND TO REMAND
THE CASE TO THE CIRCUIT COURT FOR BALTI-
MORE CITY FOR FURTHER PROCEEDINGS CONSIS-
TENT WITH THIS OPINION; COSTS IN THIS COURT
AND IN THE COURT OF SPECIAL APPEALS TO BE
PAID BY THE MAYOR AND CITY COUNCIL OF BALTI-
MORE.