UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ALEX STEVENSON, by and through his
father and next friend, Elmer
William Stevenson; ELMER WILLIAM
STEVENSON, on his own behalf,
          *Plaintiffs-Appellants,*

v.

MARTIN COUNTY BOARD OF
EDUCATION; WILLIE C. PEELE,
Superintendent of Martin County
Schools, individually and in his
official capacity; HARRY D. RESPASS,
Principal of Williamston Middle
School, individually and in his
official capacity; SWANOLA CHANCE,
teacher at Williamston Middle
School, individually and in her
official capacity,
          *Defendants-Appellees.*

No. 99-2685

Appeal from the United States District Court
for the Eastern District of North Carolina, at New Bern.
Malcolm J. Howard, District Judge.
(CA-99-84-4-H3)

Argued: September 25, 2000

Decided: February 6, 2001

Before MICHAEL, MOTZ, and TRAXLER, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Robert John McAfee, MCCOTTER, MCAFEE & ASHTON, L.L.P., New Bern, North Carolina, for Appellants. Michael Crowell, THARRINGTON SMITH, L.L.P., Raleigh, North Carolina, for Appellees. **ON BRIEF:** Charles K. McCotter, Jr., MCCOTTER, MCAFEE & ASHTON, L.L.P., New Bern, North Carolina; Stacey B. Bawtinhimer, LAW OFFICE OF STACEY B. BAWTINHIMER, New Bern, North Carolina, for Appellants. Lisa Lukasik, THARRINGTON SMITH, L.L.P., Raleigh, North Carolina, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Alex Stevenson, by his father, Elmer William Stevenson, and the senior Mr. Stevenson, on his own behalf, brought this action under 42 U.S.C. § 1983 against the Martin County Board of Education and several school officials. Alex alleged that the defendants violated his liberty interest in bodily integrity and his property interest in a public education when they allowed his classmates to physically assault him at school over a period of several weeks. Alex also alleged a violation of the Safe and Drug-Free Schools and Communities Act as well as constitutional and common law claims under North Carolina law. The district court dismissed the complaint for failure to state a claim and declined to exercise supplemental jurisdiction over the state law claims. Because Alex has not alleged sufficient facts to hold the school board or its officials liable for federal constitutional violations and because a private right of action is not available under the Safe Schools Act, we affirm the dismissal of the federal claims. We also hold that the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over the state law claims.

## I.

The complaint sets forth a disturbing set of facts, which we take as true. In August 1998 ten-year-old Alex Stevenson began the sixth grade at Williamston Middle School in Martin County, North Carolina. He did not finish the year there, however. In November his father had to remove him from Williamston Middle School and enroll him in a private school because of the repeated assaults Alex suffered at the hands of several of his classmates.

The abuse started as soon as the school year began. On August 7, 1998, the second day of school, Alex's sixth-grade classmates Charles McEachern and Kemadrick Terrell Sherrod robbed and assaulted Alex in the lunch yard. Several days later on August 10 Sherrod threw books at Alex, and Sherrod was subsequently suspended. On August 20 McEachern picked a fight with Alex in retaliation for Sherrod's suspension. The school suspended both McEachern and Alex because of this fight.

On August 20 Alex's father, Elmer William Stevenson ("Stevenson"), met with the principal of Williamston Middle School, Harry Respass. At this meeting Stevenson told Respass that McEachern was threatening Alex, and he (Stevenson) expressed his concern that McEachern and his friends would seek revenge on Alex. Stevenson then requested that the school remove Alex from McEachern's classes. Although Respass assured Stevenson that the boys would be placed in separate classes, this was not done.

For the next month (from mid-August to mid-September) McEachern continued to harass and intimidate Alex. As he walked past Alex's locker, McEachern would hit and kick Alex in the head, chest, and back. Alex and his father complained to Principal Respass and school counselor Babbie Mills about these assaults, but McEachern was neither disciplined nor removed from Alex's classes.

The situation reached a new low on September 18. Alex and McEachern were in Swanola Chance's first-period art class, and McEachern wrongly accused Alex of breaking his glasses. When Alex denied it, McEachern began to punch Alex in the head. Alex temporarily escaped from the attack and asked Chance for help, but

she responded, "There isn't anything I can do." She added, "You probably deserved it anyway." Because he was receiving no help from Chance, Alex told her that he was going to the principal's office. McEachern and a friend, Broderick Jones, followed Alex out of the classroom and chased him down the hallway. They knocked Alex to the floor, and for about ten minutes proceeded to punch and kick him in the head, throat, chest, arms, and legs. Adele Dees, a teacher in a nearby classroom, tried to stop McEachern and Jones, but they assaulted her as well. Several students eventually restrained the two attackers.

McEachern and Jones were suspended, and for several weeks they attended a school for students with disciplinary problems. Principal Respass did not, however, report the assaults to the juvenile authorities. On September 21 Stevenson filed juvenile petitions against McEachern and Jones, alleging assault with infliction of serious bodily injury. In January 1999 McEachern and Jones admitted the charges and received sentences of twelve-months probation and community service.

While the juvenile proceedings were pending, the assaults on Alex continued. On September 22 three of McEachern's friends threatened Alex during his first-period class. Alex promptly reported the threats to Principal Respass, but that did not prevent McEachern and his friends from assaulting Alex later in the day during lunch. One of the lunchtime attackers was suspended from school. On September 25 McEachern and several of his friends harassed Alex and his father while they were at a music festival in Williamston. The police intervened and escorted McEachern from the scene. Stevenson finally decided that because of the assaults and harassment, Alex would have to transfer to private school.

Alex suffered physical and emotional problems because of the repeated assaults and harassment. After the September 18 assault a doctor treated him for contusions, lacerations, and temporary eye dysfunction. A psychologist diagnosed Alex with major depression and attention deficit/hyperactivity disorder, and Alex began taking medication. He continues to receive counseling for his psychological problems.

Alex, through his father as next friend, and his father sued the Martin County Board of Education, Superintendent Willie Peele, Principal Respass, and Chance (the teacher) under 42 U.S.C. § 1983 and state law. Alex alleged that by failing to prevent McEachern and his fellow ruffians from attacking Alex, the defendants deprived him of his liberty interest in bodily integrity and his property interest in a public education, in violation of the Due Process Clause of the Fourteenth Amendment. *See* U.S. Const. amend. XIV, § 1. Alex also alleged that the defendants violated the Safe and Drug-Free Schools and Communities Act of 1994, 20 U.S.C. § 7101-7104, 7111-7143. The state law counts asserted claims of negligence, assault, negligent infliction of emotional distress, and violations of the North Carolina Constitution and the North Carolina Safe Schools Act. The district court granted the defendants' motion to dismiss, disposing of the federal claims under Fed. R. Civ. P. 12(b)(6) and the state law claims under 28 U.S.C. § 1367(c)(3). Alex and his father appeal.

## II.

We review *de novo* a grant of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "accepting as true the well-pleaded facts in the complaint and viewing them in the light most favorable to the plaintiff." *Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996). Because this is a civil rights case, we are also guided by the following additional principles. In testing the sufficiency of a civil rights complaint, "we must be especially solicitous of the wrongs alleged," and we "must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) (quoting *Harrison v. United States Postal Serv.*, 840 F.2d 1149, 1152 (4th Cir. 1988)) (internal quotation marks and emphasis omitted). Furthermore, "claim[s] under the Fourteenth Amendment merge[] into [a] § 1983 claim because § 1983 merely creates a statutory basis to receive a remedy for the deprivation of a constitutional right." *Hughes v. Bedsole*, 48 F.3d 1376, 1383 n.6 (4th Cir. 1995). Finally, we must keep in mind the difference between individual-capacity and official-capacity suits under § 1983. A suit against a government official in his individual capacity for deprivation of federal rights seeks to impose personal liability upon the official. *See Kentucky v. Graham*,

473 U.S. 159, 165 (1985). In contrast, a suit against a government official in his official capacity is treated as a suit against the government entity of which the official is an agent. *See id.* at 165-66. Local government units are liable only if an official's execution of a municipal policy, practice, or custom caused the injury. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

Reading the complaint with these principles in mind, we conclude that Alex intended to make the following three § 1983 claims; first, that Peele, Respass, and Chance deprived him of his constitutional property interest in a public education because the continued attacks forced him to leave Williamston Middle School; second, that the school officials deprived him of his constitutional liberty interest in bodily integrity by failing to stop the attacks by his fellow students; and third, that the Martin County Board of Education contributed to the violence by failing to develop appropriate school safety plans and by failing to train its school personnel in how to respond to violent students.

A.

Alex's first § 1983 claim is that the defendants deprived him of his property in violation of the Due Process Clause. When school officials suspend or expel a student, it triggers the student's property interest in a public education. *See Goss v. Lopez*, 419 U.S. 565, 572-76 (1975). However, a student is not deprived of his property interest when school officials engage in conduct such as reasonable corporal punishment, even though it has "the unintended effect of temporarily removing a child from" class. *See Ingraham v. Wright*, 430 U.S. 651, 674 n.43 (1977). In this case, Williamston Middle School officials did not suspend or expel Alex. Alex's father voluntarily withdrew Alex from school.

Alex argues, however, that the school "constructively expelled" him by fostering a climate of violence. Even though Alex failed to raise this argument to the district court, "we may consider such an issue if the error is 'plain' and our refusal to consider it would result in a miscarriage of justice." *Nat'l Wildlife Fed'n v. Hanson*, 859 F.2d 313, 318 (4th Cir. 1988).

Alex's constructive expulsion argument is a novel theory that has not yet been accepted by any court. It is inspired by constructive discharge cases arising under the employment laws. These cases hold that an employer constructively discharges an employee when the employer "deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985) (internal quotation marks and citations omitted); *see also Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 244 (4th Cir. 1997); *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1353-55 (4th Cir. 1995). In the school violence context, the theory would mean that a student's property interest in public education is triggered when school officials deliberately make the learning environment so dangerous or intolerable that the student is forced to transfer to another school.

The question of whether we should accept the constructive expulsion theory is purely academic, however, because Alex's complaint does not allege sufficient facts to support the theory. There is no allegation that the school officials acted deliberately to force Alex out of Williamston Middle School or that they singled him out in their failure to control the hooliganism. In fact, the school took some steps, although without success, to remedy the problem. Moreover, because of the novelty of the theory, it cannot be plain error for the district court to conclude that the school officials did not deprive Alex of a property interest in public education when he voluntarily withdrew from school.

## B.

Alex's second § 1983 claim is that the defendants violated his liberty interest in bodily integrity. In this case, the perpetrators of the attacks against Alex were private individuals, not the school officials. The law is clear that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). There are, however, two exceptions to this general rule.

First, if the state has a special relationship with an individual, the state has an affirmative duty to protect the individual from harm

inflicted by third parties. The Supreme Court has defined a "special relationship" in the following way:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — *e.g.*, food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by . . . the Due Process Clause. . . . [I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf — through incarceration, institutionalization, or other similar restraint of personal liberty — which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*Id.* at 200. Several circuits have been faced with the issue of whether a school-student relationship is a special relationship triggering the protections of the Due Process Clause. They have held uniformly that no special relationship exists because the student is not in physical custody and, along with parental help, is able to care for his basic human needs. *See Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1415 (5th Cir. 1997) (en banc); *Doe v. Claiborne County*, 103 F.3d 495, 510 (6th Cir. 1996); *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729, 732 (8th Cir. 1993); *Maldonado v. Josey*, 975 F.2d 727, 731 (10th Cir. 1992); *D.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364, 1372 (3d Cir. 1992) (en banc); *J.O. v. Alton Cmty. Unit Sch. Dist. 11*, 909 F.2d 267, 272 (7th Cir. 1990). This circuit has also recognized that "incarceration, institutionalization, or the like" is needed to "trigger the affirmative duty" under the Due Process Clause. *Pinder v. Johnson*, 54 F.3d 1169, 1175 (4th Cir. 1995) (en banc).

Following the lead of our sister circuits, we hold that the Martin County School officials did not have a "special relationship" with Alex that triggered the protections of the Due Process Clause in this case. When a student attends public school, his liberty is not restrained to the extent contemplated in *DeShaney*. Attending school is not the equivalent of incarceration or institutionalization. *See*

*Youngberg v. Romeo*, 457 U.S. 307 (1982) (Fourteenth Amendment imposes a duty upon the state to protect involuntary committed, mentally ill patients); *Estelle v. Gamble*, 429 U.S. 97 (1976) (the state's deliberate indifference to prisoners' medical needs violates the Eighth Amendment). Although a student must remain in school during the day and the school functions much as a parent during that time, the state has not assumed total responsibility for the student's care. The student's parents retain the ability to provide for his basic human needs, and the child remains free to seek their help and protection. *See Claiborne County*, 103 F.3d at 509-10; *D.R.*, 972 F.2d at 1371-73. Therefore, the state, simply by virtue of its maintenance of a public school system, does not become constitutionally liable for failing to prevent all student-on-student violence. Although the school officials here may have been irresponsible and ineffective in not heeding the warnings that Alex was helpless at the hands of bullies, they have not committed a constitutional violation.

The second exception to the general rule that a state is not liable for the acts of third parties occurs when the state itself creates the danger. *See DeShaney*, 489 U.S. at 201. In order to create a danger, the state has to take some affirmative steps. Liability does not arise when the state stands by and does nothing in the face of danger. *See id.* at 203. Failing to provide protection from danger does not implicate the state in the harm caused by third parties. *See Pinder*, 54 F.3d at 1175.

In *Pinder* this court was faced with a case in which it had to decide the contours of *DeShaney*'s state-created danger exception. Pinder's ex-boyfriend, Pittman, broke into her home, assaulted her, and threatened to kill her and her three children. Pinder called the police, and when an officer arrived, she told him about the attack and the threats. The officer arrested Pittman and assured Pinder that she could safely leave her children at home alone while she went to work because Pittman would be in custody. However, because the police charged Pittman with misdemeanor offenses, he was released almost immediately. While Pinder was at work, Pittman set fire to her house, killing her three children who were asleep. Pinder sued the arresting officer, claiming that he had created the danger. *See id.* at 1172. This court dismissed her suit because it was "purely an omission claim" where all that could be said was that the officer "'stood by and did nothing

when suspicious circumstances dictated a more active role.'" *Id.* at 1175 (*quoting DeShaney*, 489 U.S. at 203). The state's conduct was not on that "point on the spectrum between action and inaction" such that it was implicated in the injury. *Id.*

The facts in *DeShaney* are equally disturbing. Randy DeShaney beat his four-year-old son Joshua so severely that Joshua suffered permanent brain damage. This tragic incident came after the Winnebago County Department of Social Services (DDS) in Wisconsin had been informed of child abuse. In fact, DDS had obtained a court order placing Joshua in the temporary custody of a hospital after DeShaney's beatings put Joshua there, but thereafter DDS released Joshua into his father's custody. Caseworkers had also made monthly visits to the DeShaney home, in which they observed suspicious injuries on Joshua's body. *See DeShaney*, 489 U.S. at 192-93. The Court nevertheless held that the state was not liable for a constitutional violation. The facts only amounted to a failure of the DDS to protect Joshua from private violence and the state had no constitutional duty to protect Joshua. *See id.* at 202-03.

Given the rejection of the plaintiffs' § 1983 claims in *DeShaney* and *Pinder*, we have to conclude in this case that the school officials did not create the danger that Alex faced at the hands of his classmates. In fact, the school did more than just stand by while Alex was being brutalized. The school took some measures to remedy the situation. Principal Respass met with Alex's father to discuss the problem. In addition, the school suspended McEachern twice and eventually sent him to a special disciplinary program. Two other attackers, including Jones, were also suspended. The school surely could have done more to protect Alex, given the frequent and brutal attacks by McEachern and others. But the failure to protect by itself is not sufficient to trigger constitutional liability in this situation.

Furthermore, in the school violence context, some courts have required that school officials must act with deliberate indifference before there is liability for student-on-student attacks. *See Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1238 (10th Cir. 1999); *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 531 (5th Cir. 1994). These courts have said that the school must engage in intentional or reckless affirmative conduct that shocks the conscience of

federal judges. *See Sutton*, 173 F.3d at 1238-39. Alex has not alleged that the school officials intentionally or recklessly took steps to contribute to the violence. Teacher Chance's response when Alex reported being punched in the head does not amount to deliberate indifference when considered in context. Chance said, "There isn't anything I can do. You probably deserved it anyway." This statement appears to express frustration and resignation more than anything else. While Chance might have tried harder to help Alex, this does not mean that she deprived Alex of his constitutional rights.

For all of the above reasons, this case does not fall into the state-created danger exception to *DeShaney*.

## C.

Alex's final § 1983 claim is against the Martin County Board of Education. He alleges that the board was responsible for his brutalization because it failed to develop adequate school safety plans and failed to train teachers and administrators in proper techniques for controlling violence in school. Local government units are subject to § 1983 liability for the unconstitutional acts of their employees when the employee acts pursuant to a municipal policy, practice, or custom. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 818-19 (1985); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In addition, a municipal entity can be liable if its failure to train its employees leads to some unconstitutional conduct. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). The failure to train must amount to "deliberate indifference to the rights of persons with whom [the employees] come into contact." *Id.*

We do not have to reach the question of whether the school official's conduct in this case arose from a municipal policy or custom, nor do we have to determine whether the board's failure to train the teachers and administrators amounted to deliberate indifference. An award of damages against a municipality based on the actions of its officers is not available unless the officers' conduct amounted to a constitutional injury. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("[N]either *Monell* . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded

that the officer inflicted no constitutional harm."); *S.P. v. City of Takoma Park*, 134 F.3d 260, 274 (4th Cir. 1998) (a municipality "necessarily is not liable for any alleged injuries" where "no constitutional violation occurred"); *Belcher v. Oliver*, 898 F.2d 32, 36 (4th Cir. 1990) ("Plaintiff's effort to turn this lawsuit into one for inadequate training of personnel . . . is unavailing where there has been no underlying constitutional infraction."). Because we have already determined that Alex's allegations do not amount to a § 1983 violation on the part of the school officials, it follows that the school board likewise cannot be held constitutionally liable.

### III.

Alex also argues that the defendants violated the Safe and Drug-Free Schools and Communities Act of 1994 (Safe Schools Act), 20 U.S.C. §§ 7101-7104, 7111-7143, by failing to develop an appropriate school safety plan that would help control student-on-student violence. The Safe Schools Act is a federal grant program that aims to prevent violence and drug abuse in schools. These goals are accomplished through federal assistance to states so that they can make grants to local educational agencies and community organizations. Federal money also goes to fund private, non-profit organizations and colleges and universities that develop anti-violence and anti-drug initiatives. *See* 20 U.S.C. § 7103. The Act does not expressly create a private right of action. Therefore, we must determine whether Alex has an implied right to maintain a Safe Schools Act claim.

In answering this question, we must first decide if the Act grants Alex any substantive rights. For a person to bring a claim under conditional spending legislation, the statute must confer substantive rights in favor of the class to which the person belongs. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981). Substantive rights are created only if Congress provided the recipients of federal funding clear notice that by accepting funds, they have chosen to participate in a statutory scheme under which private individuals gain enforceable rights. *See id.* at 24-25. Because the Safe Schools Act was enacted pursuant to the Spending Clause, Alex's claim will be allowed only if the statute puts funding recipients on notice of a private right of action.

Stevenson relies on *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999), to argue that the Safe Schools Act puts schools receiving federal funds on notice that their students can sue them for failing to implement school safety plans. In *Davis* the plaintiff, on behalf of her minor daughter, sued a school board under Title IX of the Education Amendments Act of 1972, *see* 20 U.S.C. §§ 1681-1688, after her daughter was sexually harassed by one of her classmates when she was in fifth grade. The plaintiff alleged that the school failed to take any measures against the harasser even though her daughter repeatedly reported the incidents to teachers and to the principal, asking them for help. *See id.* at 633-35. The Court held that Title IX supported a private damages action against a school for severe student-on-student harassment because the statutory scheme put schools on notice that they could be held liable for their failure to respond to students' discriminatory acts, if the failure amounted to deliberate indifference. The Court pointed to the language of the statute itself, which makes schools liable if they subject persons to discrimination under their programs or activities or deny students educational benefits. In addition, the Court relied on the fact that the Department of Education had promulgated regulations requiring recipients of federal funds to monitor third-party discrimination. *See id.* at 643-45. The Court added that the common law puts schools on notice because it allows "claims alleging that schools have been negligent in failing to protect their students from the torts of their peers." *Id.* at 644.

Unlike Title IX, the Safe Schools Act does not put schools on notice that they can be sued for failing to implement anti-violence programs. Alex has not pointed to anything in the language or purpose of the Act that would suggest otherwise. The Department of Education has not promulgated any regulations pursuant to the Act. Furthermore, no court has held that the Safe Schools Act creates a private right of action in *any* situation, whereas for Title IX, it had already been established before *Davis* that Title IX creates a cause of action for damages when the school officials themselves engage in the discriminatory conduct. *See Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60 (1992); *Cannon v. University of Chicago*, 441 U.S. 677 (1979).

The fact that the common law might allow suits against schools for student-on-student violence does not help Stevenson either. The Court

in *Davis* placed little, if any, emphasis on the common law in reaching the conclusion that Title IX gave schools notice of a private right of action for student-on-student harassment. It only mentioned the common law after discussing the language, purpose, and regulations of Title IX. There is nothing in *Davis* to suggest that the common law alone could put the recipient of federal funds on notice that a Spending Clause statute creates a private right of action. We hold that because the Safe Schools Act does not put schools on notice of the creation of an enforceable substantive right, Alex cannot bring a Safe Schools Act claim.

## IV.

Alex also brought several state law claims against the defendants, alleging negligence, assault, and negligent infliction of emotional distress, violations of North Carolina's constitutional right to an education, N.C. Const. art. 1, § 15, art. 9, § 2, and violations of the North Carolina Safe Schools Act, N.C. Gen. Stat. § 115C-105.45. Once the district court dismissed the federal claims, it exercised its discretion to decline supplemental jurisdiction over the state claims. *See* 28 U.S.C. § 1367(c). We review a district court's decision not to exercise supplemental jurisdiction for abuse of discretion. *See Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 203 (4th Cir. 1997). The district court did not abuse its discretion in this case. It made a prudent decision in light of the fact that Stevenson had not stated a claim under § 1983.

## V.

To summarize, we hold that all three of Stevenson's § 1983 claims were properly dismissed under Fed. R. Civ. P. 12(b)(6). The school officials did not deprive Alex of his property interest in a public education because they did not expel or suspend him. The officials likewise did not deprive him of his liberty interest in bodily integrity because they did not prevent him from taking care of himself, nor did they create the dangerous situation he found himself in. The school board cannot be held liable where there was no underlying constitutional violation. We also hold that there is no private right of action under the Safe and Drug-Free Schools and Communities Act, nor is it possible to assert the statutory claim through § 1983 because the

Act does not put schools on notice that they are open to suit by private parties. Finally, the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over the state law claims. The judgment is affirmed.

*AFFIRMED*