Dawn A. PULLIUM

v.

John CERESINI, et al.

No. CIV.A. WMN–01–1959.

United States District Court,
D. Maryland.

March 5, 2002.

Alan S. Town, Barbara R. Graham, Law Office, Rockville, MD, for Plaintiff.

Joann Robertson, Sharon V. Burrell, Office of the County Attorney for Montgomery County MD, Rockville, MD, for Defendant.

## MEMORANDUM

NICKERSON, District Judge.

Before the Court is a Motion to Dismiss filed by Defendants John Ceresini and Montgomery County, Maryland. Paper No. 3. The motion is fully briefed. Upon a review of the motion and the applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that the motion will be granted in part and denied in part.

## I. FACTUAL BACKGROUND

This case arises out of an incident that occurred in the early morning hours of September 21, 2000, involving the Plaintiff, Dawn Pulliam; her estranged husband, Allen Pullium; and several officers of the Montgomery County Police Force, including Defendant John Ceresini. The factual allegations related to this incident, as set out in the Complaint, are as follows.

Plaintiff separated from her husband in July of 2000. After the separation, Plaintiff's husband moved in with his girlfriend in Germantown, Maryland, and Plaintiff moved into a home in Frederick County, Maryland, with her children and grandchildren. On or about August 20, 2000, Plaintiff filed for a divorce.

On September 20, 2000, when Plaintiff returned home from work at about 3:00 in the afternoon, she found her husband there, unconscious as a result of alcohol and/or drug abuse. Plaintiff left her home, but then returned at about 11:00 p.m. When she returned, Mr. Pullium was sitting on the curb, drinking an alcoholic beverage. According to the allegations in the complaint, he was intoxicated and verbally abused Plaintiff.

Mr. Pullium then demanded that Plaintiff drive him to his girlfriend's home in Germantown, about 20 miles away. Plaintiff complied. While in route, Mr. Pullium "punched Plaintiff in the head numerous times and verbally threatened her." Complaint at ¶ 12. Plaintiff left her husband at his girlfriend's home and returned to her home in Frederick County.

At about 1:00 a.m. on September 21, 2000, the Montgomery County Police re-

ceived a 911 call from a woman that resided in the house with Mr. Pullium and his girlfriend. She told the police that Mr. Pullium was "drunk as a rat" and was banging on the door, demanding to be let in. Police officers were dispatched to the scene, including Officer Ceresini. At about 1:40 a.m., Officer Ceresini telephoned Plaintiff and told her that she needed to come and pick up her husband. Plaintiff refused and informed Officer Ceresini that Mr. Pullium "did not live with her, that he had assaulted her earlier in the day, and that she had filed for divorce." *Id.* at ¶ 16. Officer Ceresini allegedly responded that Plaintiff had a "moral responsibility" to come and retrieve her husband. *Id.* at ¶ 17. Plaintiff again indicated that she was refusing to come to pick him up.

Plaintiff states in her complaint that she believes that the Montgomery County Police received additional emergency calls concerning Mr. Pullium's drunken and irrational behavior and, at about 3:00 a.m., decided to take him into custody. At about 3:40 a.m., Plaintiff was awakened by loud knocking on her front door. An individual identifying himself as a Montgomery County Police officer, and driving a marked Montgomery County Police car, demanded that Plaintiff open the door of her home. He was accompanied by Mr. Pullium. After she initially refused to open the door, telling the officer that Mr. Pullium did not live at this address and that she was afraid that he would hurt her, the officer "became angry and loudly ordered Plaintiff to open the door." *Id.* at 21–22. After Plaintiff pleaded with the officer not to leave her husband at her home, the officer, "using an even louder and angrier tone, ordered Plaintiff to 'Open the door, NOW.'" *Id.* at 24.

Plaintiff opened the door, but continued to express her fear that Mr. Pullium was going to hurt her. Mr. Pullium, visibly intoxicated or under the influence of drugs, shouted obscenities at Plaintiff in the officer's presence. Nonetheless, the officer allowed Mr. Pullium to enter the house and then the officer returned to his car and drove away. About ten minutes later, Mr. Pullium assaulted Plaintiff.

Based upon this course of events, Plaintiff brought claims against Officer Ceresini, the as-yet unidentified officer that brought Mr. Pullium to her home ("Officer Doe"), and Montgomery County. The Complaint contains five counts. Counts I and II are brought pursuant to 42 U.S.C. § 1983: Count I alleging an unreasonable search and seizure, and Count II alleging a violation of due process and a deprivation of equal protection. In Count III, Plaintiff asserts that forcing her to open her door constituted a seizure which violated Articles 24 and 26 of the Maryland Declaration of Rights. Count IV asserts a claim of negligence against Officers Ceresini and Doe, and Count V a claim of invasion of privacy against Officer Doe. Counts VI and VII assert claims against the County: Count VI for negligence in the supervision and training of the officers, and Count VII asserting indirect liability under a theory of respondeat superior.

On January 7, 2002, the Court dismissed, without prejudice, the claims against Officer Doe, based on Plaintiff's failure to identify and serve this defendant. In responding to the show cause order that precipitated that dismissal, Plaintiff complained that the County has refused to provide the identity of the officer that left Mr. Pulliam at Plaintiff's home. Nevertheless, Plaintiff consented to the dismissal, recognizing that the identity of that officer would need to be revealed through discovery.

Defendants' motion seeks the dismissal of all claims against Officer Ceresini and the County.

## II. STANDARD FOR MOTION TO DISMISS

When reviewing a 12(b)(6) motion to dismiss, the court must assume all of the allegations to be true, must resolve all doubts and inferences in favor of the plaintiff, and must view the allegations in a light most favorable to the plaintiff. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir.1999). The complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## III. DISCUSSION

■ Relief under 42 U.S.C. § 1983 is available to a plaintiff who demonstrates that a police officer acting under color of state law deprived the plaintiff of a right, privilege, or immunity secured by the United States Constitution or by the federal law. Plaintiff alleges that an unlawful "seizure" occurred in violation of the Fourth Amendment when she was ordered by the police to open the door and admit her estranged husband into her home. Plaintiff argues that because this same affirmative conduct exposed her to external danger in the form of harm from a third person, it also violated the due process clause of the Fourteenth Amendment.[1]

Defendants' primary argument that Officer Ceresini is not liable under § 1983 is based on the characterization of his alleged conduct being "simply call[ing] Plaintiff and ask[ing] her to come and get her husband." Motion at 4. In response, Plaintiff argues that it is a fair inference from the Complaint that, because it was Officer Ceresini that responded to the initial 911 call and telephoned Plaintiff, he is also the one who responded to the later calls and was responsible for sending Mr. Pulliam to her home. Plaintiff does not rule out the possibility that Officer Ceresini was the unidentified officer who knocked on her door and ordered her to admit Mr. Pulliam. *See* Opp. at 5.

■ Given that no discovery has taken place in this action and that the County has thus far refused to provide the identity of "Officer Doe," the Court will assume for the purposes of this motion that Officer Ceresini and Officer Doe are one and the same individual, or at the least, that Officer Doe was acting under the direction of Officer Ceresini in taking Mr. Pullium to Plaintiff's home and leaving him there. Plaintiff cannot be faulted for failing to detail Officer Ceresini's specific role in her complaint when the information related to that role is in the exclusive control of Defendants. Furthermore, while Defendants disparage Plaintiff for not being able to assert whether or not it was Officer Ceresini who ordered her to open her door, *see* Reply at 2 (questioning whether Plaintiff was inebriated and thus, not able to recognize Officer Ceresini), the Court notes that Plaintiff had never met Officer Ceresini before and had only spoken briefly with him on the telephone, after having been awakened in the middle of the night.[2]

1. The Complaint also alleges violations of the Fifth Amendment. Plaintiff apparently concedes that there was no Fifth Amendment violation. *See* Opp. at 4–5

2. Defendants argue in their reply that "Plaintiff's allegation that the County has refused to identify the officers involved is inconsistent

with Plaintiff's ability to name Officer Ceresini as one of the defendants." Reply at 1. The Court could infer from this argument that Defendants are acknowledging that they have identified all of the officers that were involved in the incident, which would mean that Officer Ceresini was the officer that delivered Mr. Pullium to Plaintiff's home.

Defendants' secondary argument for dismissal of the § 1983 claims against Officer Ceresini is premised on their assumption that the Court of Appeals for the Fourth Circuit would not recognize the "state-created danger" theory upon which the decisions cited by Plaintiff were based.[3] *See* Opp. at 6 (citing *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir.1992); *Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989); *Kneipp v. Tedder*, 95 F.3d 1199 (3rd Cir.1996)). In attempting to anticipate the position of the Fourth Circuit on this issue, Defendants cite two cases: *Pinder v. Johnson*, 54 F.3d 1169 (4th Cir.), *cert. denied*, 516 U.S. 994, 116 S.Ct. 530, 133 L.Ed.2d 436 (1995) and *Piechowicz v. United States*, 885 F.2d 1207 (4th Cir.1989). Neither of these cases, however, predict a hard and fast rule against the application of a "state-created danger theory."[4] Furthermore, while in both decisions the court found no liability under § 1983, both decisions are readily distinguishable on their facts.

In *Pinder*, a police officer responded to a domestic disturbance and arrested the plaintiff's boyfriend. Although the police officer assured the plaintiff that the boyfriend would remain in custody so that it would be safe for her to go to work and leave her children at home, the boyfriend was released almost immediately. The boyfriend returned to the plaintiff's house while she was at work and set fire to it, killing the plaintiff's three sleeping children. The Fourth Circuit held that the

plaintiff's § 1983 claim was properly dismissed because it was "purely an omission claim," where the officer merely "'stood by and did nothing when suspicious circumstances dictated a more active role.'" 54 F.3d at 1175 (quoting *DeShaney*, 489 U.S. at 203, 109 S.Ct. 998).

In *Piechowicz*, the plaintiffs were the survivors of two individuals that were murdered by a contract killer to prevent those individuals from testifying in a federal drug prosecution. The plaintiffs sued the Assistant United States Attorney and the DEA agent who handled the prosecution, arguing that the defendants "did too little to prevent the tragedy." 885 F.2d at 1209. The Fourth Circuit held that the defendants were immune from suit on the ground that there was no affirmative conduct on the part of the defendants, opining that, "substantive due process protects the liberty interests only of persons affirmatively restrained by the United States from acting on their own behalf." 885 F.2d at 1215.

In contrast to these two decisions, the instant case involves affirmative conduct on the part Officer Ceresini (or another officer under his direction). The officer injected Mr. Pulliam into Plaintiff's home, thus creating a danger where previously none existed. According to the allegations in the Complaint, Mr. Pulliam would not have been in a position to assault Plaintiff if he had not been driven to her home by

---

**3.** Defendants do not argue that the facts alleged would not give rise to a state-created danger, were the Fourth Circuit to adopt such a theory.

**4.** The Court notes that the Fourth Circuit has, in fact, recently recognized the validity of the state-created danger theory, albeit in an officially unpublished decision and under facts that the court held did not give rise to § 1983 liability. *Stevenson v. Martin County Board of Educ.*, 3 Fed.Appx. 25 (4th Cir.), *cert. denied*, —— U.S. ——, 122 S.Ct. 54, 151 L.Ed.2d

23 (2001). In that case, involving student-on-student violence brought against the school board and school officials, the court noted:

> [An] exception to the general rule that a state is not liable for the acts of third parties occurs when the state itself creates the danger. *See DeShaney [v. Winnebago County Dep't of Soc. Servs.]*, 489 U.S. [189,] 201, 109 S.Ct. 998, 103 L.Ed.2d 249 [(1989)]. In order to create a danger, the state has to take some affirmative steps.

3 Fed.Appx. at 31.

the officer and if the officer had not ordered Plaintiff to admit him, over her repeated and impassioned protestations. While the Fourth Circuit may be reluctant to impose liability on police officers whose omissions create increased dangers from third parties, there is no indication that the court would have the same reluctance where it is an officer's affirmative conduct that creates the danger. *See, Stevenson v. Martin County Board of Educ., supra; see also, Wood v. Ostrander, supra* (holding that § 1983 claims should be allowed to go forward where jury could have found that the defendant officer had affirmatively created the particular danger that exposed plaintiff to third party violence); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982)("If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.").

■ Defendants also argue that, even if the officer's(s') conduct violated Plaintiff's constitutional rights, Officer Ceresini is entitled to qualified immunity. The Court is unable to reach such a conclusion, at least at this stage in the litigation. According to the allegations in the complaint, and drawing all inferences in Plaintiff's favor, Officer Ceresini was either directly or indirectly responsible for placing Plaintiff's in harm's way. Any reasonable officer in Officer Ceresini's position should have been aware that an affirmative act on the part of an officer that places an individual in clear and imminent danger implicates that individual's constitutional liberty interest. *See L.W. v. Grubbs*, 974 F.2d at 121 (district court erred in dismissing § 1983 claim where "Defendants affirmatively created the dangerous situation which resulted in [plaintiff's] assault"); *Wood, supra.*[5] While discovery ultimately may cast a very different light on the events of that morning, the Court must assume at this juncture that the officer, knowing that Mr. Pullium was highly intoxicated and that he had assaulted his wife earlier in the evening, and having heard Mr. Pulliam verbally abuse her in his presence, nonetheless, forced Plaintiff to open the door and admit Mr. Pulliam into her home, and then drove away.

For these reasons, Defendants' motion to dismiss as to the § 1983 claims against Officer Ceresini will be denied. As the provisions of the state constitution upon which Plaintiff rely are interpreted in *pari materia* with those of the federal constitution, the motion will be denied as to those claims against Officer Ceresini as well.

■ As to the County, the Court agrees with Defendants that Plaintiff has failed to state a claim for a violation of

---

5. The Court is aware that no decision of the Supreme Court or the Fourth Circuit has found § 1983 liability under facts similar to those presented here. On the other hand, the Court is not aware of any decision from any circuit declining to impose liability in the face of affirmative police conduct that so obviously endangered a private citizen. The lack of decisional authority defining the constitutional right in this specific context does not imply that the unlawfulness of the conduct under the Constitution is not apparent. "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the 'very action in question has [not] previously been held unlawful.'" *United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)(*quoting Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). *See also K.H. Through Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir.1990)("The easy cases don't even arise. There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances.").

§ 1983. As is now well established, a municipality cannot be held liable under principles of *respondeat superior* for unauthorized federal constitutional torts committed by police officers. *See Monell v. Dept. of Social Servs. of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To find a municipality liable under § 1983, a plaintiff must show that the complained of action was taken pursuant to some custom or policy of the municipality. *Id.* The Complaint does not contain allegations of such a custom or policy and, given the somewhat unique nature of the incident that gives rise to this action, it would be somewhat surprising if Plaintiff could allege that the County had created a custom or policy that would govern the conduct at issue. The § 1983 claim against the County will be dismissed.

The Court must reach a different result as to the Maryland constitutional tort claims against the County. The Maryland Court of Appeals has clarified that, while the protections of the state and federal constitutions may be similar, "different rules apply with respect to the remedies available for those violations." *DiPino v. Davis*, 354 Md. 18, 50, 729 A.2d 354 (1999). Particularly relevant to this action, the court has held that "local government entities do, indeed, have respondeat superior liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of the employment." *Id.* at 51–52, 729 A.2d 354.

■ Turning to the negligence claims against Officer Ceresini and the County, the Court finds that these claims will be allowed to go forward. It is well established that there is no actionable tort duty on the part of police officers to protect someone from the criminal acts of a third person in the absence of either a statute or a special relationship. *Ashburn v. Anne*

*Arundel County*, 306 Md. 617, 628, 510 A.2d 1078 (1986). The parties seem to agree that the establishment of a special relationship also deprives the officer of the benefits of any immunities. *See Williams v. Mayor and City Council of Baltimore*, 359 Md. 101, 753 A.2d 41 (2000). Thus, the central question presented as to this aspect of Defendants' motion becomes whether or not there existed a "special relationship" between Officer Ceresini and the Plaintiff or Mr. Pullium.

Not surprisingly, there is no reported Maryland decision that discusses the presence or absence of a special relationship in a context such as presented here, *i.e.,* where a police officer's affirmative conduct directly facilitated a third party's ability to do injury to the plaintiff. The cases relied upon by Defendants involve situations where the police failed to take someone into custody and that failure later caused harm to the plaintiff. *See, e.g., Ashburn* (officer elected not to arrest intoxicated driver who later struck a pedestrian); *Holson v. State*, 99 Md.App. 411, 637 A.2d 871 (1994)(officer arrested driver of vehicle but left intoxicated passenger by the roadside who was struck by another car shortly thereafter). In *Williams*, the case upon which Plaintiff primarily relies, the plaintiff claimed that the defendant officer had promised that he would stay outside the plaintiff's home and protect her and her daughter from the plaintiff's boyfriend. The Court of Appeals held that, if the officer had indeed made that promise, he may have created a special relationship upon which tort liability could be based. 359 Md. at 150–151, 753 A.2d 41.

Obviously, none of these cases are factually analogous to the case now before the Court. They do provide some guidance, however. *Williams* teaches that "the determination of whether a special relationship exists is to be done on a case-by-case

basis." *Id.* at 150, 753 A.2d 41. *Williams* also teaches that "although courts have found special relationships under a variety of circumstances, a court is generally more likely to find such a relationship when the police have taken some affirmative action." *Id.* at 146, 753 A.2d 41.

This Court finds some additional guidance in a recent decision from the Supreme Court of Montana, *LaTray v. City of Havre,* 299 Mont. 449, 999 P.2d 1010 (2000). In *LaTray,* police officers responded to an emergency call that two girls were fighting. Arriving at the scene, the officers found two intoxicated sisters. After noting that one of the girls was injured and appeared to have attempted to commit suicide by slashing her wrists, the officers took her into protective custody and transported her to the hospital for medical and psychological evaluations. The officers also transported the other sister, Shawn, to the hospital.

During the ride to the hospital, Shawn was argumentative and acted in "an increasingly agitated manner." *Id.* at 452–53, 999 P.2d 1010. When they arrived at the hospital, an emergency room nurse came out to the police car to render assistance. When the nurse reached out to examine the injured sister's injuries, Shawn assaulted the nurse. The nurse then brought a negligence action against the city that employed the police officers, alleging that the officers failed to exercise proper control over one in their custody.

In reversing the trial court's determination that the city owed no duty to the plaintiff, the Montana Supreme Court distinguished the case before it from its prior decision in *Phillips v. City of Billings,* 233 Mont. 249, 758 P.2d 772 (1988), a decision that arose under facts very similar to the

Maryland Court of Appeals's *Ashburn* decision relied upon by Defendants.[6] The Montana Supreme court observed:

> Traditionally, as we have recognized, a person is not liable for the actions of another and is under no duty to protect another from harm in the absence of a special relationship of custody or control. Such a duty may arise where, as here, the special relationship is "custodial by nature," thus requiring the defendant to exercise reasonable control over his or her charge so as to prevent foreseeable harm to others.

> .     .     .     .     .

> Here, in contrast to the situation presented in *Phillips,* the City's police officers entered into a "special relationship of custody or control" over Shawn, thus giving rise to a duty of care to third persons. While it is true that the officers did not actually arrest Shawn or otherwise have a basis for taking her into legal custody, they voluntarily undertook "possession or custody" of Shawn in transporting her to the hospital. In so doing, they "took charge" of her person and, consequently, harbored the "ability to control" her actions to prevent an unreasonable risk of harm to third persons.

With respect to foreseeability in the context of duty, we have ascertained that duty is defined by the scope of the risk which negligent conduct foreseeably entails. [I]n analyzing foreseeability in the duty context, ... we look to whether or not the injured party was within the scope of risk created by the alleged negligence of the tortfeasor—that is, was the injured party a foreseeable plaintiff?

The special relationship that existed between the officers and Shawn gave

---

6. In *Phillips,* an intoxicated motorist ran a red light and crashed into the plaintiff's vehicle. Two hours before the accident, the intoxicated driver had been questioned by police officers who smelled alcohol on the driver's breath and observed empty beer cans in his vehicle but, nonetheless, declined to arrest him.

rise to a duty of care to foreseeable plaintiffs like [the plaintiff]. If a reasonably prudent defendant has no reason to foresee any danger of direct injury [to the plaintiff] nor any risk from an intervening cause, then the defendant is not negligent. Based upon Shawn's combative and agitated demeanor on the day in question, a reasonably prudent defendant would have foreseen that a failure to adequately restrain or otherwise control Shawn could pose an unreasonable risk of harm to others in her vicinity. . . . We determine that by voluntarily assuming custody of Shawn and transporting her to the hospital, the officers assumed the "ability to control" her action to prevent harm to bystanders, like [the plaintiff] who fall within the scope of the risk which negligent supervision would foreseeably entail.

*LaTray* 299 Mont. at 457–58, 999 P.2d 1010 (internal quotations and citations omitted).

■ This Court has no difficulty in concluding that the Maryland Court of Appeals, if confronted with the facts before this Court, would find, as the Court did in *LaTray,* that a "special relationship" was created when the officer(s) took custody of Mr. Pullium and transported him to his wife's home. Here, the foreseeability of injury is significantly more obvious.

This Court would agree that, under Maryland law, had the officer(s) done nothing and left Mr. Pullium in front of his girlfriend's house, no special relationship would have arisen to support a negligence claim. Had the officer(s) taken Mr. Pullium into custody and later released him from the police station, again, there would be no liability. But to transport him to Plaintiff's front door, force Plaintiff to open the door, and observe him enter the home, clearly constitutes the kind of affirmative conduct that gives rise to a special

relationship upon which liability could be based.

■ Finally, as to any liability for negligence on the part of the County, the Court finds that the County is entitled to governmental immunity that would bar any claim on either a direct liability theory or on a theory of respondeat superior. The type of police conduct at issue in this action is clearly governmental in nature, *see, Claiborne v. Cahalen,* 636 F.Supp. 1271 (D.Md. 1986), and Plaintiff presents no argument that the County has waived its immunity so as to allow a tort action to proceed against the County for the tortious acts of its employees.

## IV. CONCLUSION

For the reasons stated above, the Court will grant Defendants' Motion to dismiss insofar as it seeks dismissal of the § 1983 and negligence claims against Montgomery County. The motion will be denied as to all other claims. A separate order will issue.

### ORDER

In accordance with the foregoing Memorandum and for the reasons stated therein, IT IS this _____ day of March, 2002, by the United States District Court for the District of Maryland, ORDERED:

1. That Defendants' Motion to Dismiss, Paper No. 3, is hereby GRANTED in part and DENIED in part, in that the motion is granted as to the 42 U.S.C. § 1983 and negligence claims brought against Montgomery County, Maryland, but denied as to all other claims; and

2. That the Clerk of the Court shall mail or transmit copies of the foregoing Memorandum and this Order to all counsel of record.